RICHARD T. BOWLES (#46234)
COLIN G. FURLOW (#319219)
Bowles & Verna LLP
2121 N. California Blvd., Suite 875
Walnut Creek, CA 94596
Telephone: (925) 935-3300
Facsimile: (925) 935-0371
Email:      rbowles@bowlesverna.com
            cfurlow@bowlesverna.com

Attorneys for Plaintiffs WOBIG LLC,
a California LLC, and MARC LURIE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WOBIG LLC, a California Limited Liability Company; and MARC LURIE, as Co-Trustee of The Lurie Family Trust;<br><br>        Plaintiffs,<br><br>v.<br><br>TIMOTHY WOBIG, and individual; WOBIG LLC, a Nebraska Limited Liability Company; and FORTI-TAC LLC, a Nebraska Limited Liability Company;<br><br>        Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **CONVERSION**<br>2. **FRAUD**<br>3. **TORTIOUS INTERFERENCE WITH CONTRACT**<br>4. **TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>5. **PATENT INFRINGEMENT**<br>6. **TRADEMARK INFRINGEMENT**<br>7. **COPYRIGHT INFRINGEMENT**<br>8. **BREACH OF CONTRACT**<br>9. **DECLARATORY JUDGMENT** |

        Plaintiffs WOBIG LLC, a California Limited Liability Company, and MARC LURIE, in his capacity as Manager of Wobig LLC and Co-Trustee of The Lurie Family Trust, a Member of Wobig LLC, bring this Complaint against Defendants TIMOTHY WOBIG, an individual, WOBIG LLC, a Nebraska Limited Liability Company, and Forti-Tac LLC, a Nebraska Limited Liability Company, and allege as follows:

## **NATURE OF THE ACTION**

        1.      This is an action seeking immediate injunctive relief to prevent Defendant Timothy Wobig from continuing to actively harm the company he co-founded with Plaintiff Marc Lurie in

1

2022—a California Limited Liability Company known as "Wobig LLC"—which makes a portable gear stand for tactical, military-style body armor.

2. While Mr. Wobig launched an attempt to push Mr. Lurie out of the company in early 2025, Plaintiffs bring this action now because Mr. Lurie recently learned that Mr. Wobig has formed a copycat LLC in Nebraska with the exact same name, but with himself as the sole member, and is passing off this Nebraska doppelganger as the "real" company to exclude his partners in the California Wobig LLC, including Mr. Lurie, who is the Manager and holds a 44% ownership interest. In so doing, Mr. Wobig has misled and continues to mislead customers into believing they are transacting with the California LLC that holds the patent rights to the company's product. The California LLC is entitled to payment for these product orders, which Mr. Wobig has converted for his own benefit by instructing customers to place orders with him personally.

3. Mr. Wobig has further convinced the China-based factory that manufactures the gear stand for Wobig LLC to deal solely with Mr. Wobig, to the exclusion of Mr. Lurie. Accordingly, the factory has refused to ship orders to the California LLC. This leaves the company in dire straits: it does not have enough inventory to issue quotes against major new opportunities and barely enough inventory to fulfill existing orders over the next several weeks. By cutting off the California LLC's ability to replenish its inventory, Mr. Wobig seeks to divert new opportunities as well as the company's existing customers and dealers for his own benefit. As such, the factory's refusal to deal with the legitimate California LLC because of Mr. Wobig's false claims of sole ownership now pose an existential threat to the California LLC's ability to continue operations.

4. Corporate disagreements between Mr. Wobig and Mr. Lurie aside, Plaintiffs seek urgent injunctive relief because Mr. Lurie learned on September 8, 2025 that Mr. Wobig was using the California Wobig LLC's DoD-issued CAGE number to falsely impersonate the California LLC and to redirect an order from the military to himself and his Nebraska copycat LLC. A CAGE code is a unique identifier issued by the Department of Defense to vendors and suppliers wishing to do business with the military and used, among other things, to associate security clearances with each vendor and supplier and their facilities. It is a mandatory process and requirement for would-be suppliers to the military. Even though Mr. Wobig is a military officer, and as such intimately aware

of the purpose and rules regarding CAGE code usage, it appears that Mr. Wobig used the California LLC's CAGE code to fraudulently divert payment by the Department of Defense away from accounts controlled by the California LLC for the company's largest sale to the military in its history, risking not only the company's solvency but also putting it in danger of immense reputational harm and entanglement in Mr. Wobig's potential civil and criminal violations.

5.    Just last week, as of the time of filing, Mr. Lurie learned that Mr. Wobig is also attempting to divert new potential orders for the company's product by the military of a major U.S. ally. Similarly, only days ago, Mr. Lurie learned that Mr. Wobig has formed another Nebraska LLC called "Forti-Tac LLC" and has applied with the U.S. Patent and Trademark Office for federal registration of the trademark "Wobig Portable Gearstand." Mr. Wobig submitted his federal trademark application <u>not</u> on behalf of *either* the California or Nebraska Wobig LLC's names, but under the name of the newly-formed Forti-Tac company that has absolutely no legitimate claim to a mark the California-based Wobig LLC has used in commerce since 2023.

6.    As it stands now, Plaintiffs are likely to run out of inventory in a matter of weeks, and are unable to confidently submit bids on major potential business opportunities with deadlines in the next few days and weeks because they cannot be sure they will be able to fulfil those orders. On behalf of the California LLC, Mr. Lurie seeks immediate judicial intervention.

## **PARTIES**

7.    Plaintiff Wobig LLC is a California Limited Liability Company formed in 2022 (California entity number 202253019342). To avoid further confusion, the Complaint hereinafter references the Plaintiff LLC as "California Wobig LLC." As laid out in the current Operating Agreement, the Members of California Wobig LLC are Timothy Wobig; The Lurie Family Trust (of which Marc Lurie is Co-Trustee); and Patrick Burgess. Per the most recent Statement of Information filed with the California Secretary of State, and as agreed upon by all members up until this conflict arose, California Wobig LLC's sole Manager is Marc Lurie. California Wobig LLC's principal place of business is Mr. Lurie's home at 2950 Windtree Court in Lafayette, California.

8.    Plaintiff Marc Lurie is an individual residing in Lafayette, California. He is the sole Manager California Wobig LLC. In his capacity as Co-Trustee for The Lurie Family Trust, he

1  holds a 44% membership interest in California Wobig LLC.

2      9.      Defendant Timothy Wobig is an individual residing at 20603 Hascall Street in

3  Elkhorn, Nebraska. He holds a 51% membership interest in California Wobig LLC. The most recent

4  Statement of Information for the California Wobig LLC (filed July 21, 2024) identifies Mr. Wobig as

5  the CEO of Wobig LLC.

6      10.     Defendant Wobig LLC is a Nebraska Limited Liability Company (Nebraska entity

7  number 2504243464). To avoid further confusion, the Complaint hereinafter references this

8  Defendant LLC as "Nebraska Wobig LLC." According to the Nebraska Secretary of State's website,

9  Nebraska Wobig LLC was formed on April 28, 2025 and its principal place of business is 20603

10 Hascall Street in Elkhorn, Nebraska (Mr. Wobig's residence). Upon information and belief, Timothy

11 Wobig is the sole member.

12     11.     Defendant Forti-Tac LLC is a Nebraska Limited Liability Company (Nebraska entity

13 number 2508339580). According to the Nebraska Secretary of State's website, Forti-Tac's principal

14 place of business is also 20603 Hascall Street in Elkhorn, Nebraska. Upon information and belief,

15 Timothy Wobig is the sole member. Forti-Tac was formed, according to the Nebraska Secretary of

16 State, on August 18, 2025.

17     12.     Upon information and belief, Nebraska Wobig LLC and Forti-Tac LLC are both alter

18 egos of Defendant Timothy Wobig, who uses these corporate forms as a mere shell for his personal

19 affairs.

20              **JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT**

21     13.     This Court has subject matter jurisdiction over this matter under 28 U.S.C.

22 § 1332(a)(1) because there is complete diversity between the parties and the amount in controversy

23 exceeds $75,000 exclusive of interest and costs. It further has federal question jurisdiction under 28

24 U.S.C. § 1331 because this matter involves patent, trademark, and copyright infringement.

25     14.     This Court has personal jurisdiction over Defendants because they have transacted

26 business in California. Tim Wobig is a member of California Wobig LLC, a California LLC, and

27 Defendant Nebraska Wobig LLC has also engaged in business in California. Upon information and

28 belief, as Mr. Wobig's alter-ego, Forti-Tac LLC has also transacted business in California.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2), and this Court's Oakland Division is appropriate, because California Wobig LLC's principal place of business is in Lafayette, Contra Costa County, California, and a substantial part of the events or omissions giving rise to this lawsuit took place in Contra Costa County.

**FACTS**

**Formation of the California LLC and Product Concept**

16.     Defendant Timothy Wobig first contacted Marc Lurie in 2021. Mr. Lurie is a designer and inventor with multiple patents to his name developed over a 40-year career. He holds a background product development and manufacturing and has brought multiple products from conception to production over the decades.

17.     Mr. Wobig is a veteran of the Marines and the Army, with a military career spanning 23 years. Mr. Wobig approached Mr. Lurie after identifying the need for a portable gear stand to support and store combat body armor. Mr. Lurie independently developed a conceptual design that eventually became the present product, and the two formed California Wobig LLC as a California Limited Liability Company, which was registered with the California Secretary of State in October 2022.

18.     Under the terms of the Operating Agreement (attached as **Exhibit 1**), Mr. Wobig holds a 51% membership interest in California Wobig LLC. Mr. Lurie holds a 44% interest as Co-Trustee for The Lurie Family Trust. A third member, Patrick Burgess, who co-engineered the product with Mr. Lurie, holds a non-voting 5% interest.

19.     As a result of Mr. Lurie's efforts, including drafting the patent specification, California Wobig LLC obtained two patents for a "portable equipment stand." The first patent, a U.S. Design Patent, No. US0D1057806S, was issued January 14, 2025. The second patent, a U.S. Utility Patent, was recently approved by the U.S. Patent and Trademark Office, but a patent number has not yet been assigned. An image of the design drawings, together with an image of the actual product in use holding body armor (as taken from the company's website) are depicted below:

5

COMPLAINT

20.     As part of the business' formation, Mr. Lurie and Mr. Wobig agreed to a division of responsibilities. Mr. Lurie (with Mr. Burgess' assistance) agreed to be responsible for the design, manufacture, and quality management of the product. Mr. Wobig agreed to be responsible for sales and marketing. Because Mr. Lurie had over 30 years' experience with startup companies, all members agreed that Mr. Lurie would be the Manager of California Wobig LLC, which is Manager-managed under the Operating Agreement.

21.     Despite this agreement, Mr. Wobig did not meaningfully contribute to any sales or marketing of the product. Trade shows are the primary means of generating sales and partnership leads in the industry, and Mr. Wobig did not attend a single trade show to market the product until January 2025, despite the product entering the market in December 2023. At that January 2025 trade show, he arrived a day late, left a day early, and spent much of the time in his hotel room.

22.     After trade shows, social media is the second most important lead-generation method. Mr. Wobig has contributed only a token eight social media posts on behalf of the company, recorded one 57-second video for the company's homepage, and has made no serious effort to develop a social media presence for the product. Mr. Wobig has not meaningfully contributed to the company's website or engaged in other marketing activities. Due to Mr. Wobig's lack of meaningful effort, Mr. Lurie instead shouldered the vast majority of sales and marketing responsibilities for California Wobig LLC until he sought to bring in an additional salesperson.

**Bringing In an Additional Salesperson**

23.     Despite being the member with the largest interest in the company, Mr. Wobig provided no significant contribution to its operation or benefit. Because he appeared to be unlikely to do so in the future, Mr. Lurie and Mr. Wobig mutually agreed to bring in an outside salesperson. In late December 2024, Mr. Lurie, as Manager for California Wobig LLC, identified a qualified candidate who was very highly respected in the industry, and who was also a former Navy medic. Mr. Lurie and Mr. Wobig negotiated amongst themselves and agreed to offer the candidate an equity stake in California Wobig LLC. They conveyed a written offer to the candidate for a 20% equity stake in the company on December 12, 2024, and the candidate immediately accepted.

24.     This new salesperson immediately revamped the company's social media presence. In a few weeks, the salesperson generated more than four times the number of Instagram followers for the company than Mr. Wobig generated over two years. More importantly, the salesperson set up meetings with executives from a number of potential partners, including some of the largest companies operating in the tactical and defense product market, many of whom wanted to sell the company's products or work with the company to develop new products. One such executive met with this new salesperson at the January 2025 trade show, and in subsequent email conversations estimated California Wobig LLC's product could generate more than $560,000 in annual revenue in partnership with that company.

25.     The salesperson also arranged an opportunity for Mr. Wobig to be interviewed by soldiersystems.net, the premier daily web publication covering the tactical industry. Rather than seize the opportunity to market the company's product to a highly-receptive audience in a widely-read publication, Mr. Wobig left the trade show a day early, telling Mr. Lurie that the new salesperson could take the interview instead.

**Reneging On the Salesperson's Equity Agreement**

26.     Three days after the trade show ended, on January 27, 2025, Mr. Wobig wrote to Mr. Lurie reneging on their mutual promise to give the new salesperson equity in the company. This change in position came completely out of the blue, since Mr. Wobig had never expressed dissatisfaction with the new salesperson's performance, and in fact had implicitly endorsed his

performance by asking him to sit for the important interview in Mr. Wobig's stead.

27. Mr. Wobig did not respond to Mr. Lurie's attempts to discuss the matter. On February 12, 2025, Mr. Lurie informed Mr. Wobig—who had ignored outreach attempts via phone, text message, and email—that the salesperson indicated he no longer wanted to work for California Wobig LLC because of Mr. Wobig's refusal to honor the equity agreement. At this point the salesperson had worked for California Wobig LLC for months and was forced to leave with no compensation of any kind, costing the company its best sales asset and only dedicated salesperson.

**Ownership Dispute and Unjustified Attempt to Expel Mr. Lurie**

28. On February 12, 2025, after the salesperson had left, and with Mr. Wobig still refusing to respond to any of Mr. Lurie's outreach attempts, Mr. Lurie wrote to Mr. Wobig that it was time to consider the best path forward to amicably end their business relationship. In an email, he stated "You can keep not responding to my emails or texts or you can face this head on . . . We need to schedule a time to talk by phone to figure out the best path to unwind our relationship."

29. Mr. Wobig did not respond. Instead, on February 18, Mr. Lurie received an email from counsel that Mr. Wobig had retained. Without any attempt at reaching an amicable resolution whatsoever, counsel for Mr. Wobig sent a document entitled "Written Consent of the Members of Wobig LLC in Lieu of a Meeting," which purported to remove Mr. Lurie as the Manager of California Wobig LLC. This purported Written Consent is attached as **Exhibit 2**. Citing not a single fact in support of its contentions, the document accused Mr. Lurie of breaching his fiduciary duties, unilaterally attempting to dissolve the company, and obstructing the company's business operations. The document purported to appoint Mr. Wobig as replacement Manager. California Wobig LLC's third member, Mr. Burgess, was not involved in this so-called "Written Consent." It was merely Mr. Wobig, by himself, declaring that he was now in charge.

30. Mr. Lurie responded via email to counsel on February 19, 2025 at 10:34 a.m., noting that under the Operating Agreement, a Manager could only be removed by a 75% affirmative vote of the voting members. Since the third member, Mr. Burgess, did not hold a voting interest, Mr. Wobig controlled 53.7% of the voting shares, and Mr. Lurie controlled the remaining 46.3%. (*See* Operating Agreement at **Exhibit 1**, Section 2.01 [Voting Units of Members] and Section 10.08 ["Company

Vote" meaning affirmative vote of at least 75% of the Voting Interest].) Accordingly, Mr. Wobig did not have the right to unilaterally remove Mr. Lurie as Manager.

31.     Instead of acknowledging error, Mr. Wobig's counsel responded via email on February 19 at 2:34 p.m. with a second document, entitled "Revoking Membership Interest & Expulsion of Marc Lurie," purporting to expel Mr. Lurie as a member of California Wobig LLC. This document also purported to terminate Mr. Lurie's right to future distributions and extinguish any other rights he held as a member of the LLC other than as a silent and powerless holder of a transferrable interest. Mr. Lurie by this point had worked as Manager and Chief Product Officer for four years to build the company and its product line, and contributed far more to the company than Mr. Wobig.

32.     This second document, like the first, accused Mr. Lurie of breaching his fiduciary duties, mismanaging the company, interfering with company business, and failing to act in good faith—again, without listing a single fact in support of its bald legal contentions. Nor does this document cite any legal authority or provision in the Operating Agreement that would enable Mr. Wobig to dispossess Mr. Lurie of his right to distributions. The document is attached as **Exhibit 3**. While the document purports to be dated February 18, 2025, metadata from the document indicates it was first created on February 19 at 1:19 pm, just before counsel sent it to Mr. Lurie and well after Mr. Lurie responded to the first email pointing out that Mr. Wobig lacked the necessary 75% voting authority to remove him as Manager.

33.     Aside from its lack of any factual foundation, this purported expulsion appears to be a sloppy attempt to strip Mr. Lurie of his voting interest in California Wobig LLC in order to accomplish his termination as Manager, since the first attempt was so blatantly deficient. This purported expulsion also failed to comply with the Operating Agreement's requirement for a 14-day cure period for any alleged breach by a member following receipt of a notice of intent to expel that member under Section 7.04 of the Operating Agreement. The purported expulsion claimed to be "effective immediately."

**Public Statements Ostracizing Mr. Lurie Under Guise of Military Authority**

34.    Shortly afterwards, on February 22, 2025, Mr. Wobig improperly used his official U.S. military email address to disseminate a message to a wide swath of recipients addressed as "WOBIG Team / Partners / Vendors and Potential Clients."  Under the subject line "Important Update from Wobig LLC," the email claimed that Mr. Lurie was no longer authorized in any capacity to represent California Wobig LLC, and directed recipients to "Please ensure that all communications, transactions, and inquiries related to Wobig LLC are directed to me."  Instead of limiting his communication to those with a need to know, Mr. Wobig instructed recipients to "disseminate this information to your peers and to the lowest level." This email is attached as **Exhibit 4.** Upon information and belief, Mr. Wobig sent this email to every contact in the company's industry database, including both existing and prospective customers and partners of California Wobig LLC.

35.    Mr. Wobig's use of his rank, unit designation, and an official ".mil" military email account to make an announcement concerning California Wobig LLC was highly improper, and a violation of the Department of Defense's Joint Ethical Regulations, including § 2-508 ("Restrictions on Monetization of Name, Image, or Likeness Pertaining to Status as DoD Employee or Military Service Member"), since it lent the appearance of government endorsement to his personal business venture with Mr. Lurie and the disparaging statements about Mr. Lurie contained in the email.

36.    As may be expected within a veteran-led industry, Mr. Wobig's February 22 email generated swift and extensive damage to the reputations of Mr. Lurie and California Wobig LLC. On February 24, 2025, the company's outside manufacturer's representatives terminated their relationship with California Wobig LLC. On February 26, the company's largest customer cancelled all regularly scheduled product development meetings and put all joint marketing and reselling plans on indefinite hold. On March 4, the vendor that previously estimated California Wobig LLC's products would bring in $560,000 in annual revenue put all development projects on indefinite hold.

**Attempts to Divert Orders from the California LLC and Block Payment to the LLC**

37.    Prior to Mr. Wobig's email instructing that all future company business correspondence go directly to him, California Wobig LLC had fulfilled an order totaling $3,052 in product value, which shipped on or about January 30, 2025. As a result of Mr. Wobig's interference,

1    the order recipient refused to pay the amount when due. When Mr. Lurie contacted the purchaser, he

2    was told "this invoice has been discussed with Tim Wobig." As a further example of the reputational

3    damage, the purchaser thereafter refused all further communication with Mr. Lurie.

4        38.    Around that same time, counsel for Mr. Wobig was attempting to negotiate with Mr.

5    Lurie for Mr. Wobig to purchase Mr. Lurie's interest in the company. Despite denying that Mr.

6    Wobig had blocked payment, counsel suggested that he would have the purchaser release payment as

7    a gesture of good-faith settlement efforts. Mr. Wobig then privately emailed the purchaser with that

8    direction. The purchaser released payment to California Wobig LLC <u>the next morning</u> after

9    previously refusing to make payment for nearly two months. The purchaser added Mr. Lurie to the

10   email reply to Mr. Wobig showing proof of payment, which is how Mr. Lurie came to know that Mr.

11   Wobig stopped blocking the payment.

12   **<u>Interference with the Factory and Misappropriation of Product Designs</u>**

13       39.    The gear stand made by California Wobig LLC is built to precise tolerances that few

14   factories are capable of manufacturing. Accordingly, California Wobig LLC developed a multi-year

15   relationship with a particular factory in China, capable of delivering the required quality of product.

16   This relationship began in 2023. California Wobig LLC invested over $31,000 to develop proprietary

17   tooling for the product, together with <u>nine months</u> of Mr. Lurie's time selecting materials and

18   processes as well as testing and refining both the tooling and early prototypes before reaching a

19   production-ready state for the patented product.

20       40.    On March 4, 2025, the CEO of the factory spoke with Mr. Lurie and explained that

21   Mr. Wobig had contacted the factory claiming to control the California Wobig LLC and to *personally*

22   own the tooling for the product. Mr. Wobig instructed that the factory should refuse to do business

23   with Mr. Lurie, refuse to accept orders from him, and ship all orders to a new location. Since that

24   time, the factory has refused to accept new orders or communicate with Mr. Lurie about California

25   Wobig LLC, and instead has only taken orders from Mr. Wobig and fulfilled orders to alternate

26   locations under Mr. Wobig's personal control.

27       41.    This leaves California Wobig LLC in the position of having only a few weeks of

28   inventory on hand to fulfill orders and no means of replenishing that inventory, despite years of

investment in tooling and refining the product manufacturing process and developing the patent for the product. As it stands now, the factory is using California Wobig LLC's design and utility patents and proprietary tooling to manufacture California Wobig LLC's patented product, but excluding the legitimate patent assignee California Wobig LLC from the process and profits entirely, in favor of Mr. Wobig personally.

42.     Furthermore, before this dispute arose, Mr. Lurie transmitted to the factory engineering files for the next generation of products in development by California Wobig LLC. In fact, the factory had already begun producing prototypes for testing. Upon information and belief, because Mr. Wobig has falsely painted himself as the sole operator and controller of the company, Mr. Wobig has induced the factory to turn over these engineering files and/or CAD files to Mr. Wobig's custody and control, misappropriating California Wobig LLC's assets. Mr. Wobig had previously attempted to obtain CAD files from co-inventor Mr. Burgess, who did not provide them.

**Formation of a Copycat LLC in Nebraska and Further Diversion of Company Business**

43.     In addition, in order to further divert business away from California Wobig LLC, in April 2025, Mr. Wobig formed a new company impersonating California Wobig LLC.

44.     Incorporated in Nebraska, this new copycat "Wobig LLC" shares the exact same name as California Wobig LLC, down to the missing comma between "Wobig" and "LLC." The Nebraska Secretary of State's website lists Mr. Wobig as the sole organizer of Nebraska Wobig LLC, which was registered on April 28, 2025, and lists a Nebraska address as its place of business—Mr. Wobig's personal residence.

45.     Upon information and belief, Mr. Wobig's goal in forming this copycat LLC is to defraud the California Wobig LLC in which Mr. Lurie and co-inventor Mr. Burgess still maintain an interest, to fraudulently place orders for California Wobig LLC's patented product with the factory under the pretense of being the same entity, and to otherwise steal the fruits of Mr. Lurie's years of labor and investment in California Wobig LLC.

46.     Customers, vendors, and potential business partners have fallen for Mr. Wobig's ruse. For example, the largest body armor manufacturer in the USA (and second largest globally) had been in communication with California Wobig LLC since January 2024 about the company's gear stand—

including witnessing product demonstrations and attending in-person meetings at trade shows. If this company were willing to offer the gear stand as an "add-on" purchase option for customers submitting orders for body armor, it would be a major business expansion opportunity for California Wobig LLC.

47.     Around the time Mr. Wobig launched his attempt to expel Mr. Lurie and take control of the company, this body armor manufacturer indicated it wanted to enter a formal reseller relationship. And so it did—but with Mr. Wobig's Nebraska copycat. Mr. Lurie learned of this diverted opportunity when someone at the body armor manufacturer mistakenly emailed California Wobig LLC attaching a statement of account dated August 2025, reflecting recent orders for 18 units totaling $1,393.20. When Mr. Lurie followed up, this individual supplied a copy of a check in that amount, apparently cashed to an account controlled by the copycat, *i.e.* Mr. Wobig personally.

48.     To enable this reseller to better advertise the company's patented products, Mr. Wobig also provided the reseller with graphics and "sell sheets" personally created by Mr. Lurie, which the reseller is now displaying on its website[1], which means that Mr. Wobig is also perpetuating wholesale theft of California Wobig LLC's proprietary marketing materials.

49.     Moreover, Mr. Lurie recently discovered that Mr. Wobig attempted to usurp another business relationship with a reseller that only established communication with California Wobig LLC in June 2025—months after Mr. Wobig's attempt to wrest control from Mr. Lurie and subsequent estrangement from the California LLC. In August 2025, that reseller made an order for one of the largest quantities of product in the company's history. In September 2025, it placed a second order for more than twice as many units as the original order. Sometime between the first and second orders, however, the reseller was contacted by Mr. Wobig—who inquired how the reseller "came to be selling *my* product." Mr. Wobig then instructed the reseller to place orders with him directly, and to make payment via a link that he would provide.

50.     Unclear as to who was actually in charge and who was the proper person to deal with, on September 3, 2025, the reseller's CFO emailed Mr. Wobig, later forwarding the email to Mr.

---

[1]https://pointblankshops.com/products/wobig-portable-gearstand?srsltid=AfmBOoq4YpkiAvTUOpAxo3sfCERoKABUhLp75jNEuUg-Ef7L2LQFp0SA

COMPLAINT

Lurie. In relevant part, as an example of the ongoing harm Mr. Wobig is doing to the California LLC, the email stated:

> [W]e would like to better understand the relationship between WOBIG LLC, the California entity and WOBIG LLC the Nebraska entity referenced in the attached NDA. In performing some research, it appears the patent for the stand is held by the California entity, Patent NO: (US D1,057,806 S). The patent documents and CA LLC documents list yourself along with other owners/inventors; however, the Nebraska entity does not include the other owners/inventors and does not appear to hold any legal title to the product.
>
> While we believe the portable gearstand is an innovative product with significant utility, we take our partnerships seriously and do not want to act in bad faith in any of our business dealings. I am sure you can understand our concerns and provide an explanation for the ultimate ownership of the product as well as the relationships existing between the entities and owners/inventors. In the meantime we will be pausing our continued ordering of gearstands as we await a response from both entities.

51.    According to the reseller, Mr. Wobig has not responded to date. Upon information and belief, the NDA referenced in the email and provided by Mr. Wobig to the reseller is a copy of the NDA authored by Mr. Lurie for the benefit of California Wobig LLC. Upon information and belief, Mr. Wobig copied wholesale all of the California LLC's operational, marketing, legal, and engineering materials for his personal use in impersonating the company.

**Fraudulent Misuse of Company's CAGE Code with the U.S. Military**

52.    In one of his most recent abuses, Mr. Wobig has fraudulently used California Wobig LLC's CAGE code in communications and orders placed by the U.S. military.

53.    Prior to the current dispute, in November 2024, personnel within the U.S. Special Operations Command (USSOCOM) requested that California Wobig LLC quote enough product to outfit an entire Unit of an elite force of the U.S. military. Security and identity verification are mandatory requirements in contracting with the Department of Defense, so the California LLC went through the process of acquiring a unique CAGE code, which it furnished to USSOCOM through a Form 889. California Wobig LLC therefore provided the requested quote under the CAGE code it had obtained.

54.    Unbeknownst to Mr. Lurie until approximately three weeks ago, Mr. Wobig inserted himself in the middle of the process when it came time to fulfill the order and collect payment. Using the factory whose agreement is with California Wobig LLC to produce the gear stand which is patented by the California LLC, Mr. Wobig fulfilled the order and then directed payment made by USSOCOM to an account outside California Wobig LLC's access or control.

55.    USSOCOM had no idea that, when it was dealing with Mr. Wobig, it was not dealing with California Wobig LLC, and was in fact making payment to an account controlled by Mr. Wobig personally, for his own benefit or the benefit of his imposter Nebraska Wobig LLC. In a September 9, 2025 email, personnel from USSOCOM confirmed that Mr. Wobig did not submit a new or separate Form 889 or CAGE code, and instead completed the transaction using the California LLC's CAGE code. A copy of this email, redacted to keep the identity of the military personnel confidential, is attached **Exhibit 5.**

56.    These misrepresentations to the U.S. government, aside from exposing the legitimate California Wobig LLC to potential entanglement in Mr. Wobig's civil and criminal violations, are actively doing harm to California Wobig LLC's goodwill and reputation, and are a major breach of trust. In this case, in order to address the breach and attempt to repair the reputational damage caused by Mr. Wobig, Mr. Lurie made the decision to offer the next order by this particular military unit at no charge—but clearly such reputational repair efforts are unsustainable.

57.    Mr. Wobig's attempts to divert business away from the California Wobig LLC for his personal benefit and the benefit of his copycat Nebraska Wobig LLC are ongoing and expanding on a daily basis. At the time of filing, Mr. Lurie learned only a week ago that Mr. Wobig appears to be similarly attempting to divert potential orders for up to 600 units by the military of a major U.S. ally. Mr. Wobig is attempting to do so by utilizing one of his "dealers" to submit a lower bid than offered by California Wobig LLC and its legitimate dealer—a bid that if accepted will be fulfilled by the Nebraska Wobig LLC. Even if Mr. Wobig does not succeed in diverting the order, however, his competing bid puts the California Wobig LLC in the position of having to unnecessarily low-bid against its own patented products. Moreover, Mr. Wobig's interference with the factory means that California Wobig LLC might not be able to fulfill the entire 600 unit order because of its diminished

product inventory that it cannot restock.

**Formation of Forti-Tac LLC and False Representations in Trademark Application**

58.     Only just days before this filing, Mr. Lurie *further* discovered that Mr. Wobig formed another Nebraska LLC, "Forti-Tac LLC," in conjunction with a trademark application he filed with the U.S. Patent and Trademark Office on September 11, 2025. This Trademark Application is attached as **Exhibit 6**. The application is made on behalf of Forti-Tac as the purported owner and applicant of a Mark for "Wobig Portable Gearstand."

59.     Despite records from the Nebraska Secretary of State showing that Forti-Tac was only first formed on August 18, 2025, the application represents that the proposed mark has been in use since December 2023—which is the first time that California Wobig LLC began using the term "Wobig Portable Gearstand" in commerce. With remarkable brazenness, the application identifies the California LLC's website, and includes screenshots from the California LLC's website as example "specimens" of use. Despite purporting to seek registration of ownership of the mark on Forti-Tac's behalf, Mr. Wobig in the application references the mark as affiliated with "my first product" and "my website." In blatant contradiction of these claims, the website contains a statement that "WOBIG and WOBIG Portable Gearstand are trademarks of Wobig LLC."[2]

60.     The application also reveals that Mr. Wobig created a doppelganger website impersonating the real company website. While the California Wobig LLC's website is "www.wobiggear.com," Mr. Wobig provides contact information in the application for "tim@wobig**s**gear.com," a domain which currently links to an "Opening Soon" page under construction. This appears to be a further effort to deceive the public and divert orders and sales leads away from the real company.

61.     Mr. Wobig signed the application after making a declaration that "to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce," and that "to the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other

---

[2] https://www.wobiggear.com/pages/intellectual-property

1   factual contentions made above have evidentiary support." Mr. Wobig signed the application under

2   threat of criminal penalty for making willful false statements under 18 U.S.C. § 1001.

3   **Summary, Current Status, and Urgency of Requested Relief**

4          62.    In sum, Mr. Wobig came to Mr. Lurie with a broad-strokes request for a product that

5   would hold body armor and be portable. Mr. Lurie, who had actual design, engineering and

6   manufacturing experience, developed specific product designs and worked with co-inventor Patrick

7   Burgess, who he sourced, to turn the vague idea of the product into a concrete reality through years of

8   product development, prototyping, investment in tooling, and establishment of a relationship with a

9   factory that could meet the specific manufacturing demands. After Mr. Lurie performed all the heavy

10  lifting of actually obtaining a patent and getting a product to market, Mr. Wobig put minimal effort

11  into the sales and marketing responsibilities he agreed to perform. When Mr. Lurie attempted to bring

12  in a highly-respected salesperson to perform the job Mr. Wobig wasn't doing, Mr. Wobig agreed to

13  give the salesperson equity, then reneged on the agreement to the company's detriment after it had

14  already conveyed a written offer to the salesperson, which the salesperson accepted. When

15  confronted, and at a time when the company finally appeared to be taking off and generating interest

16  in the market, Mr. Wobig unilaterally attempted to terminate Mr. Lurie as Manager of the company.

17  When that effort failed, Mr. Wobig then attempted to expel Mr. Lurie from the company under utterly

18  fabricated pretenses. Since then, Mr. Wobig has not only betrayed the other members of California

19  Wobig LLC by forming a copycat Nebraska LLC to divert business solely to himself, but has actively

20  harmed the California LLC by diverting payments away from it, causing confusion for customers

21  about who controls "Wobig LLC" and what "Wobig LLC" even refers to as a corporate entity,

22  misusing the California LLC's CAGE code, interfering with its relationship with the factory, and

23  most recently filing a trademark application falsely claiming ownership of the California LLC's mark

24  on behalf of a brand new company that appears to be the personal puppet and alter-ego of Mr. Wobig.

25  As rightful Manager of California Wobig LLC, and as a member holding a 44% interest of California

26  Wobig LLC, Mr. Lurie seeks immediate judicial intervention to prevent this harm from continuing.

27         63.    At the time of filing, California Wobig LLC has approximately 200 units of product

28  left in its inventory. It is being asked at this very moment to quote orders for a total of 600 units for

the military of a major U.S. ally, which it cannot do confidently because it cannot get the factory in China to ship orders to it in order to restock because of Mr. Wobig's interference. Based upon reliable past sales data, it estimates it needs to keep 1,500-2,000 units on hand in order to meet existing sales opportunities. Even submitting an order for "fast boat" shipping from the factory, which the factory would be able to supply within 1-2 weeks if not blocked by Mr. Wobig, shipping time would take another 30 days on top of the 1-2 week manufacturing time. If California Wobig LLC is unable to successfully place an order with the factory in the immediate future, it will not only be losing a "once-in-a-company" opportunity to quickly expand into international markets with the U.S. ally, but will leave its current dealers and suppliers high and dry during the busiest buying period of the year.

## FIRST CAUSE OF ACTION

### Conversion – Against Timothy Wobig and Nebraska Wobig LLC

64.     Plaintiffs incorporate the preceding paragraphs as though fully laid out herein.

65.     Timothy Wobig, acting on his own behalf and as the organizer and controller of Nebraska Wobig LLC, has committed various acts of conversion by wrongfully exercising dominion and taking possession of property which rightfully belongs to California Wobig LLC, and interfering with the California LLC's rights over that property.

66.     By forming a copycat entity in Nebraska that shares the exact same name as California Wobig LLC, and by instructing vendors, resellers, customers, and members of the public to transact only with Mr. Wobig directly, Mr. Wobig interfered with business opportunities that rightfully belonged to California Wobig LLC. These opportunities were more than speculative or hypothetical, and involved transactions for specific product quantities and determinable monetary sums. As described above, Defendant Wobig inserted himself into transactions that were already in progress, and accepted payment for orders for the benefit of himself and Nebraska Wobig LLC where the payment was rightfully the property of California Wobig LLC. Mr. Wobig also took orders for transactions that had not yet been initiated by the California Wobig LLC, inserting himself at the starting point of transactions by presenting to customers as the face of the California LLC, when in fact he was not.

67.     By instructing the factory to only deal with him, and by advising the factory that he

was the sole legitimate controller of the portable gear stands that the factory manufactured for California Wobig LLC, Mr. Wobig also wrongfully interfered with the California LLC's rights over control, production, and delivery of the gear stands.

68.     By wrongfully claiming sole ownership and control over the company in representations to the factory in China, Mr. Wobig also converted the proprietary tooling developed by Mr. Lurie for California Wobig LLC's benefit at a cost of $31,000.

69.     California Wobig LLC has been harmed by Mr. Wobig's conversion, which continues on an ongoing basis. The California LLC is unable to replenish its inventory, and is unable to receive and fulfil orders that Mr. Wobig has wrongfully converted for his own benefit, and continues to be deprived of payment it is rightfully entitled to for orders that Mr. Wobig is actively diverting. If Mr. Wobig is not stopped, the California LLC will be forced out of business.

## SECOND CAUSE OF ACTION

### Fraud – Against Timothy Wobig and Nebraska Wobig LLC

70.     Plaintiffs incorporate the preceding paragraphs as though fully laid out herein.

71.     Timothy Wobig, acting on his own behalf and as the organizer and controller of Nebraska Wobig LLC, fraudulently induced members of the U.S. military to believe they were transacting with California Wobig LLC when they placed orders for the portable gear stand conceptualized, designed, manufactured for, and patented by California Wobig LLC, when in fact they were transacting with Mr. Wobig for his own benefit, and for the benefit of Nebraska Wobig LLC, which held no rights to the patent, the product, or profit realized through its sale.

72.     Mr. Wobig deliberately misrepresented to military personnel, and others, that the Nebraska LLC and the California LLC were one and the same, including by using California Wobig LLC's CAGE code in transacting business for the benefit of Nebraska Wobig LLC.

73.     Mr. Wobig knew he was not acting on behalf of California Wobig LLC and knew that any payment made by the military would benefit himself and the Nebraska LLC at the expense of the California LLC, and intended to induce the reliance of such military personnel and others in making these representations.

74.     The military personnel transacting with Mr. Wobig did actually rely on these

misrepresentations in that they caused payment to be made to Mr. Wobig and Nebraska Wobig LLC rather than California Wobig LLC.

75.    Specifically, in at least one known instance, Mr. Wobig intercepted a quote prepared circa November 2024 by California Wobig LLC for a Unit within USSOCOM, as referenced above, and sometime likely between August and early September 2025 caused payment to be issued by the Department of Defense to an account he controlled, to the detriment of California Wobig LLC, by falsely misrepresenting that the Nebraska and California companies were one and the same.

76.    The California LLC was damaged as a result. In addition to reputational harm associated with breaching the trust of an important customer and potentially jeopardizing its security clearances, California Wobig LLC was deprived of payment for the order, and was also forced to offer a subsequent order at no cost in order to attempt to repair the damage done.

## THIRD CAUSE OF ACTION

**Tortious Interference with Contract – Against Timothy Wobig and Nebraska Wobig LLC**

77.    Plaintiffs incorporate the preceding paragraphs as though fully laid out herein.

78.    California Wobig LLC formed a series of agreements with the factory in China, under which the factory agreed to manufacture the portable gear stand designed, patented, and owned by the California LLC.

79.    Mr. Wobig knew that these agreements were between the factory and California Wobig LLC, and fraudulently misrepresented to the factory that orders should only be fulfilled for Mr. Wobig's benefit, delivered to locations solely under Mr. Wobig's control or at his direction, to the exclusion of the California Wobig LLC's ability to fulfil orders, and to the benefit of Nebraska Wobig LLC which Mr. Wobig passed off to the factory as the same entity as California Wobig LLC.

80.    These intentional misrepresentations actually disrupted the relationship between the factory and California Wobig LLC. The factory now refuses to accept direction or orders from Marc Lurie, the Manager of California Wobig LLC, preventing the California LLC from replenishing its inventory and threatening the continued operation of the company.

**FOURTH CAUSE OF ACTION**

**Tortious Interference with Prospective Economic Advantage – Against Timothy Wobig and Nebraska Wobig LLC**

81.    Plaintiffs incorporate the preceding paragraphs as though fully laid out herein.

82.    While not cemented into formal contractual relationships, California Wobig LLC has formed relationships with numerous customers, dealers, resellers, government entities, and businesses operating in the tactical and defense product industry, and California Wobig LLC stood to benefit from those relationships.

83.    Mr. Wobig knew of these relationships, and intentionally disrupted them for his personal benefit and the benefit of his Nebraska Wobig LLC, causing actual harm to California Wobig LLC.

84.    In one example, Mr. Wobig's public announcement using his official military email address on February 22, 2025 declaring that all orders for the gearstand should be sent to him personally and exclusively caused a vendor that previously expressed interest in buying California Wobig LLC's products and developing new ones in conjunction with California Wobig LLC, estimating it stood to earn $560,000 in annual sales revenue, to cancel all future product development meetings indefinitely and end its relationship with California Wobig LLC.

85.    In response to the same email from Mr. Wobig, California Wobig LLC's largest customer cancelled all regularly-scheduled development meetings. California Wobig LLC's outside manufacturer's representatives also terminated their relationship with California Wobig LLC.

86.    Similarly, to the extent the factory manufacturer in China maintained a relationship with California Wobig LLC that was established through informal agreements and course of dealing rather than signed written agreements, Mr. Wobig interfered with that relationship as described in the preceding paragraphs by inducing the factory to refuse to communicate with Mr. Lurie and instead accept orders and ship product solely to Mr. Wobig.

87.    Likewise, Mr. Wobig interfered with product orders placed by the U.S. military, and is currently attempting to interfere with large potential orders by the military of a major U.S. ally. Upon information and belief, Mr. Wobig has interfered with other customer, dealer, and distributor

1    relationships by similarly attempting to steer orders solely to himself.

2        88.    As described above, California Wobig LLC has been damaged by this interference.

3                        **FIFTH CAUSE OF ACTION**

4                **Patent Infringement – Against All Defendants**

5        89.    Plaintiffs incorporate the preceding paragraphs as though fully laid out herein.

6        90.    Wobig LLC, the California company, is the owner of Design Patent No.

7    US0D1057806S, issued January 14, 2025, as well as a Utility Patent for which a number has not yet

8    been issued, but for which California Wobig LLC has received a Notice of Allowance. These patents

9    are for the exclusive use and benefit of California Wobig LLC. The patent documents list the

10   Inventors as Marc Lurie, Tim Wobig, and Patrick Burgess, and list the Assignee as "WOBIG, LLC,

11   Lafayette, CA." The Design Patent claims "The ornamental design for a portable equipment stand as

12   shown and described," including as pictured above in this Complaint.

13       91.    In exercise of its patent rights, California Wobig LLC established a relationship with

14   the factory in China for production of its patented portable gear stand. This factory is the sole facility

15   currently capable of manufacturing the patented gear stand to the required specifications.

16       92.    In violation of California Wobig LLC's exclusive patent rights, Timothy Wobig, for

17   his own benefit and the benefit of Nebraska Wobig LLC, has induced the factory to make the exact

18   same product for delivery to the Nebraska LLC. The Nebraska LLC then accepts payment for the

19   product from purchasers across the United States and potentially overseas, selling it under guise of

20   the California LLC's rights, including selling to the military of the United States. This is literal, direct

21   infringement of California Wobig LLC's patent.

22       93.    This willful infringement is occurring during the term of the patents, and is ongoing.

23   This infringement is without authority from Wobig California LLC, and is to its detriment.

24                       **SIXTH CAUSE OF ACTION**

25               **Trademark Infringement – Against All Defendants**

26                    **Violation of 15 U.S.C. § 1125**

27       94.    Plaintiffs incorporate the preceding paragraphs as though fully laid out herein.

28       95.    On September 11, 2025, Mr. Wobig submitted an application to the U.S. Patent and

Trademark Office on behalf of Forti-Tac LLC, seeking to obtain trademark registration for the mark "Wobig Portable Gearstand." Despite Forti-Tac LLC only coming into existence when it was registered with the Nebraska Secretary of State on August 18, 2025, Mr. Wobig declares that Forti-Tac has used the mark in commerce "as early as 12/01/2023." (**Exhibit 6**.)

96.     This is in fact almost the exact time that California Wobig LLC made its first product sales, bringing the term "Wobig Portable Gearstand" into commercial use.

97.     The trademark application lists "www.wobiggear.com" as the URL for "specimen information" of the mark. This is not Forti-Tac's website. It is California Wobig LLC's website, and in fact the website contains a specific statement that "WOBIG and WOBIG Portable Gearstand are trademarks of Wobig LLC." The application further provides hyperlinks to product images displaying use of the mark—all of which either come from California Wobig LLC's website, or contain images and marketing materials created by California Wobig LLC and furnished to resellers to market California Wobig LLC's product.

98.     Upon information and belief, including based upon these false representations on behalf of Defendant Forti-Tac LLC that assert Forti-Tac has a legitimate ownership claim over the mark, Mr. Wobig has used the mark "Wobig Portable Gearstand" in commerce to deliberately confuse consumers and the public as to ownership and origin of California Wobig LLC's product.

99.     Although California Wobig LLC has not previously sought registration of its trademark through the U.S. Patent and Trademark Office, it has used the mark continuously in commerce since December 2023. Defendants' use of the mark "Wobig Portable Gearstand" therefore constitutes infringement of an unregistered mark under 15 U.S.C. § 1125(a) to which California Wobig LLC holds superior rights.

100.    Mr. Wobig's registration of a domain name "www.wobigsgear.com" also constitutes cyberpiracy trademark infringement under 15 U.S.C. § 1125(d) because it is deliberately confusingly similar to the website registered and operated by California Wobig LLC, "www.wobiggear.com." The insertion of an "s" in between the words "Wobig" and "gear" is an intentional effort to impersonate California Wobig LLC's website, which has existed and been used in commerce for far longer than the "wobigsgear" copycat website.

101. California Wobig LLC has been damaged by this infringement. Although it does not appear the USPTO has yet taken any action in response to Forti-Tac's application, Mr. Wobig has used the "Wobig Portable Gearstand" mark in commerce to his own personal benefit and the benefit of his alter ego companies Nebraska Wobig LLC and Forti-Tac LLC. Customers who would have purchased California Wobig LLC's portable gearstand have instead placed orders for products and issued payment to Mr. Wobig personally, who either retains the payments for himself or retains them for the benefit of the two Nebraska LLCs he controls.

## SEVENTH CAUSE OF ACTION

### Copyright Infringement – Against All Defendants

102. Plaintiffs incorporate the preceding paragraphs as though fully laid out herein.

103. In falsely representing that he controls California Wobig LLC and in dealing with customers, dealers, resellers and the public, Mr. Wobig has used materials for which California Wobig LLC holds copyright interests. For example, Mr. Wobig provided images and marketing materials to a dealer who now uses those images and materials on its Instagram page without California Wobig LLC's consent. Mr. Wobig is now using that same dealer in an attempt to outbid California Wobig LLC in a competition to win a large order of gearstands from the military of a major U.S. ally. In another example, Mr. Wobig provided product images and marketing materials to a reseller who sells the gearstand on E-Bay—a dealer that California Wobig LLC previously refused to do business with because of the harm to brand value that E-Bay listings do to its product and the risk of brand dilution working with this vendor posed, since the vendor also marketed a wide range of productions completely unrelated to the tactical and defense industry.

104. Likewise, Mr. Wobig's Trademark Application before the USPTO, which was made on behalf of Defendant Forti-Tac LLC, provides links to the website created and maintained by California Wobig LLC, and the application uses images of the gearstand to which California Wobig LLC holds copyrights. Upon information and belief, Mr. Wobig has copied wholesale all of California Wobig LLC's marketing materials, as well as other documents that Mr. Lurie drafted personally for the benefit of California Wobig LLC.

105. Moreover, upon information and belief, Mr. Wobig has induced the factory in China to

turn over CAD files and other product design specification files to Mr. Wobig's control by falsely representing that he alone controls California Wobig LLC. Mr. Wobig demanded these CAD files from product co-inventor Patrick Burgess, but Mr. Burgess did not provide the CAD files. These CAD files are also entitled to copyright protection for the benefit of California Wobig LLC.

106.    Mr. Wobig had no license or other authority to use California Wobig LLC's copyrighted materials for his own benefit and the benefit of Nebraska Wobig LLC and/or Forti-Tac LLC. He has unlawfully appropriated images, marketing materials, design files, and other materials for which California Wobig LLC has valid copyrights, to the detriment of California Wobig LLC.

## EIGHTH CAUSE OF ACTION

### Breach of Contract – Against Timothy Wobig

107.    Plaintiffs incorporate the preceding paragraphs as though fully laid out herein.

108.    The Operating Agreement for California Wobig LLC previously referenced herein and attached as **Exhibit 1** to this Complaint is a binding contract entered into by the members of California Wobig LLC.  In notarized counterparts, Mr. Lurie executed the current operative Operating Agreement on June 7, 2024 on behalf of The Lurie Family Trust, and Mr. Wobig executed the agreement on May 31, 2024.

109.    The Operating Agreement imposes fiduciary and other duties on the Manager and officers of California Wobig LLC, including those described in Section 3.03 of the Operating Agreement, which imposes duties of loyalty, duties to hold in trust any benefit received in the conduct of the company's activities or appropriation of the company's opportunities, duties to refrain from competing with the company, and other similar duties as laid out in the agreement.

110.    Mr. Wobig has at times operated as the legitimate CEO of California Wobig LLC, and still presents himself to the public as its CEO. As such, he is bound by these duties.

111.    Mr. Wobig breached these fiduciary duties in numerous ways, including by forming the copycat Nebraska Wobig LLC to act in competition with California Wobig LLC, accepting orders that were business opportunities belonging to California Wobig LLC on behalf of himself personally and the Nebraska Wobig LLC, falsely declaring in his trademark application that another company, Forti-Tac LLC, had superior rights to the "Wobig Portable Gearstand" mark in commerce, and

causing reputational harm to the company by misusing the DoD-issued CAGE code obtained for the benefit of California Wobig LLC—in addition to the other conduct described herein.

112.    The Operating Agreement also lays out proper requirements for the removal of the Manager of California Wobig LLC under Section 3.01(c), which provides that a Manager may only be removed by "Company Vote," defined in Section 10.08 to mean "the affirmative vote of seventy-five percent (75%) or more of the Voting Interest unless otherwise required by law or this Agreement."

113.    Mr. Wobig violated this section of the Operating Agreement by attempting to terminate Mr. Lurie as Manager and appoint himself as replacement Manager, despite only holding 53.7% of the Voting Interest of the LLC. Mr. Wobig refuses to acknowledge that his attempt to remove Mr. Lurie as manager was illegitimate under the Operating Agreement, and is currently falsely representing himself to customers and the public at large as the Manager of California Wobig LLC.

114.    Furthermore, Section 7.04 of the Operating Agreement provides for procedures to be followed and requirements to be met in order for a member of California Wobig LLC to be expelled. Under Section 7.04(f), a member may be expelled if the member has "materially breached or threatened to materially breach either any duties of the Company or any term, covenant, or condition of this Agreement or any other written and signed agreement with the Company and has not cured such breach within fourteen (14) days following written notice thereof by the Company to such Member."

115.    In breach of Section 7.04(f), Mr. Wobig issued a purported "Written Consent" entitled "Revoking Membership Interest & Expulsion of Marc Lurie" on February 19, 2025 (falsely backdated to February 18, 2025) that claimed to expel Mr. Lurie from membership in California Wobig LLC based upon no factual grounds whatsoever, instead making bald legal conclusions alleging Mr. Lurie engaged in unspecified breach of fiduciary duties. (**Exhibit 3**, as previously referenced.) Even if Mr. Wobig had alleged facts to support the purported expulsion, the Written Consent also failed to provide the 14-day cure period required under Section 7.04(f), in further violation of the Operating Agreement, since the notice claimed to be "effective immediately."

Moreover, Mr. Wobig's purported expulsion also claimed to deprive Mr. Lurie of his right to distributions—an outcome not supported by the Operating Agreement or in law.

116.    Mr. Lurie has performed all obligations under the Operating Agreement, or has been excused from performance.

117.    Mr. Lurie, as Co-Trustee for the Lurie Family Trust and signatory to the Operating Agreement, has been harmed as a result of Mr. Wobig's breach—as has California Wobig LLC itself. Mr. Wobig's public statements announcing Mr. Lurie's expulsion from California Wobig LLC have caused the Factory to refuse to take orders from Mr. Lurie, jeopardizing California Wobig LLC's ability to restock its inventory or fulfill orders. Mr. Lurie has also invested four years of his career and countless hours of effort in service of California Wobig LLC's pursuits, and is now being excluded from benefits flowing from that effort as a result of Mr. Wobig's breaches.

## NINTH CAUSE OF ACTION

### Declaratory Judgment

118.    Plaintiffs incorporate the preceding paragraphs as though fully laid out herein.

119.    An actual controversy exists between the parties. The disputes alleged above are ripe for review, justiciable, and the proper subject of declaratory judgment.

120.    To wit, Plaintiff Marc Lurie seeks a declaration that Mr. Wobig's attempts to terminate him as Manager of California Wobig LLC and subsequently expel him as a member of the LLC were invalid under California Wobig LLC's Operating Agreement and applicable law, and that Mr. Wobig's public representations that Mr. Lurie has no authority to act for the California LLC are false and illegitimate.

121.    Moreover, Mr. Lurie seeks a declaration that Defendant Wobig's conduct as described herein constitutes a material breach of the Operating Agreement and an ongoing harm to the company, warranting his expulsion as a member of the California LLC.

122.    Absent a judicial finding resolving the controversies described herein, these disputes cannot be resolved and there is no adequate remedy at law.

1

### <u>DEMAND FOR RELIEF</u>

2       WHEREFORE, based upon the foregoing, Plaintiffs respectfully requests this Court enter

3  judgment in their favor as follows:

4       a.       Permanent injunctive relief:

5               ●       Ordering Defendants to stop blocking product orders from the factory from

6                       being delivered to Plaintiffs and correct misrepresentations to the factory that

7                       Mr. Lurie has no authority to act on behalf of California Wobig LLC, instead

8                       affirmatively instructing the factory that Mr. Lurie does have the authority to

9                       place and receive product orders;

10              ●       Preventing Defendants' continued diversion of product orders through

11                      impersonation of the California entity Wobig LLC by use of an identically-

12                      named Nebraska LLC in interference with California Wobig LLC's customer

13                      relationships;

14              ●       Preventing continued infringement of the California LLC's patent, trademark,

15                      and copyrights by Mr. Wobig in his personal capacity, by Nebraska Wobig

16                      LLC, or by Forti-Tac LLC; and ordering Mr. Wobig and his company Forti-

17                      Tac LLC to cease falsely representing to the U.S. Patent and Trademark Office

18                      that Forti-Tac LLC has any claim to ownership of the "Wobig Portable

19                      Gearstand" mark;

20              ●       Ordering Mr. Wobig to cease development and abandon any use of the website

21                      "www.wobigsgear.com" as it appears intended to deliberately divert traffic

22                      away from the California Wobig LLC's legitimate website,

23                      "www.wobiggear.com," and transfer control of the website to California

24                      Wobig LLC;

25              ●       Ordering Mr. Wobig to cease using his official military email address to

26                      conduct business related to Wobig LLC gear stands in violation of the

27                      Department of Defense's Joint Ethical Regulations § 2-508;

28

COMPLAINT

- Ordering Mr. Wobig to cease representing to the public that he is the sole owner and controller of California Wobig LLC and that Marc Lurie has no authority to act on California Wobig LLC's behalf;

b. Declaratory judgment as to the rights of the respective parties, including judgment that Mr. Lurie's purported expulsion from membership of California Wobig LLC and termination as Manager by Mr. Wobig are invalid, and that Mr. Wobig's misconduct warrants his own expulsion as a member of California Wobig LLC;

c. Ordering an accounting of all product inventory either in Mr. Wobig's personal possession or control, or provided by Mr. Wobig to product dealers and resellers but not yet sold by them;

d. Ordering destruction of any California Wobig LLC intellectual property held by Mr. Wobig, including product CAD files, other design and engineering documents, and product images and marketing materials;

e. Disgorgement of profits obtained by Mr. Wobig, either personally or which have accrued to Nebraska Wobig LLC or Forti-Tac LLC;

f. Dissolution of the Nebraska entity Wobig LLC, given its intentional efforts to create consumer confusion and convert California Wobig LLC's assets;

g. Damages according to proof;

h. Punitive damages given the willful and knowingly fraudulent nature of Defendant Wobig's conduct;

i. Pre- and post-judgment interest;

j. Attorneys' fees and costs; and

k. Any other relief this Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: October 8, 2025                    BOWLES & VERNA LLP

By: _____
RICHARD T. BOWLES
COLIN G. FURLOW

Attorneys for Plaintiffs
WOBIG LLC, a California LLC, and
MARC LURIE

COMPLAINT

# Exhibit 1

**SECOND AMENDED AND RESTATED OPERATING AGREEMENT**

**BY THE MEMBERS OF WOBIG LLC**

**ARTICLE I ORGANIZATION OF THE COMPANY**

1.01.    <u>Formation</u>. The parties to this Agreement have agreed to the formation and are Members of Wobig LLC, a limited liability company organized under the provisions of the California Revised Uniform Limited Liability Company Act. A certificate of organization has been filed with the California Secretary of State. The Manager (as defined herein) may take such further action as it deems necessary to permit the Company to conduct business as a limited liability company in any other jurisdiction.

1.02.    <u>Principal Office</u>. The principal office of the Company shall be at 2950 Windtree Ct Lafayette CA 94540 or such place as may be designated from time to time by the Manager. The Manager may establish additional places of business for the Company.

1.03.    <u>Business of the Company</u>. The Company may engage in any business permitted by law.

**ARTICLE II MEMBERS**

2.01.    <u>Initial Members</u>. The names and addresses of the Members, their Capital Contribution, their Membership Units, and Voting Units are as follows:

| Member | Capital and Other Contribution | Membership Units | Voting Units |
|---|---|---|---|
| Tim Wobig<br>19557 Molly St Unit B<br>Elkhorn NE 68022-6550<br>timwobig @gmail.com | $5432.00 and assignment to the Company of all intellectual property related to the Patents and Patent Applications. | ***5,702*** | ***5,702*** |
| The Lurie Family Trust<br>2950 Windtree Ct<br>Lafayette CA 94549<br>marclurie@me.com | $4268.00, assignment to the Company of all intellectual property related to the Patents and Patent Applications, and services provided to date. | ***4,919*** | ***4,919*** |
| Patrick Burgess<br>1006 Columbine Rd<br>Asheville NC 28803<br>patrick@pbrworks.com | Ongoing design services to develop the company's product line and transfer to the Company of all intellectual property related to the Patents and Patent Applications, including but not limited to the SolidWorks native files. | ***559*** | ***0*** |
| Total | | ***11,180*** | ***10,621*** |

2.02.    Additional Members.

(a)    A person other than a Transferee shall become a Member of the Company upon: (i) a Company Vote; (ii) payment of the agreed upon Capital Contribution to the Company by the person; (iii) the person executes an addendum to this Agreement agreeing to be bound to its terms; (iv) the non-separated spouse, if any, of the person executes a spousal agreement vesting full power of management of the person's interest in the Company in the person; and (v) execution of the Company's non-disclosure agreement.

(b)    A Transferee becomes a Member upon: (i) a Company Vote (ii) the Transferee signing an addendum to this Agreement agreeing to be bound to its terms; (iv) the non-separated spouse, if any, of the Transferee executes a spousal agreement vesting full power of management of the Transferee's interest in the Company in the Transferee; and (v) execution of the Company's non-disclosure agreement.

(c)    A Member who has transferred his entire Transferable Interest ceases to be a Member once the Transferees of his entire Transferable Interest become Members.

(d)    Changes to the names and addresses of the Members and the names and addresses of new Members shall be identified by an addendum to this Operating Agreement.

(e)    A person shall become a Member if, within ninety (90) consecutive days after the Company ceases to have any Members and all of the following occur:

(1)    The last person to have been a Member, or the legal representative of that person, designates a person to become a Member; and

(2)    The designated person consents to become a Member.

2.03.    <u>Liability for Required Contributions</u>. A Member is liable to the Company for his Capital Contribution. In addition, any Member who fails to make a required Capital Contribution may have his Transferable Interest forfeited and he or she may be expelled as a Member of the Company pursuant to Section 7.04. A person's obligation to make a contribution to the Company is not excused by the person's death, disability, or other inability to perform personally. If a person does not make a required contribution, the person or the person's estate is obligated to contribute money equal to the value of the part of the contribution which has not been made, at the option of the Company.

2.04.    <u>Additional Capital; Limitation</u>. Other than the contributions of the Members set forth in Section 2.01 and new Members as provided in Section 2.02, no Member shall be required to make any additional contributions to the capital of the Company nor be obligated to restore any negative Capital Account as defined in Section 4.01. No Member shall have any liability to the Company, to the other Members, or to the creditors of the Company on account of any deficit balance in such Member's Capital Account except to the extent such deficit arises from the failure of the Member to contribute the full amount of his Capital Contribution which he or she was obligated to contribute. No Member shall be entitled to interest on any Capital Contribution or on such Member's Capital Account.

2.05.    <u>Member Authority Limited</u>. A Member is not an agent of the Company solely by reason of being a Member. Unless expressly authorized to do so by the Manager, no Member shall have any power or authority to bind the Company in any way or to render it financially liable for

any purpose.

2.06.    Liability of Members. The debts, obligations, or other liabilities of the Company, whether arising in contract, tort, or otherwise, belong solely to the Company and do not become the debts, obligations, or liabilities of a Member solely by reason of the Member acting as a Member.

## ARTICLE III MANAGEMENT OF THE COMPANY

3.01.    Management by Manager.

(a)    The Company is manager-managed by one (1) manager appointed by Company Vote. The conduct of the Company's business and the management of its affairs will be exercised and conducted solely by the Manager and those persons designated by them in accordance with this Agreement provided, however, that the Manager must receive prior approval by Company Vote to do any of the following:

(1)    sell, lease, exchange, or otherwise dispose of all, or substantially all, of the Company's property, with or without the goodwill, outside the ordinary course of the Company's business;

(2)    approve a merger, conversion, or domestication involving the Company;

(3)    undertake any other act outside the ordinary course of the Company's business; or

(4)    amend this Agreement.

(b)    In the case of a bona fide written offer by a third party to acquire the Company, or to purchase all or substantially all of the Company's assets, the Manager shall provide to all Members (which shall consider and treat all such information as confidential to the Company):

(1)    notice of the offer, the identity of the offeror, and a copy of the terms within fourteen (14) days of receipt of the offer; and

(2)    notice and a copy of the terms as rejected within thirty (30) days of any final rejection of such purchase or acquisition and the end of negotiations.

(c)    The Manager shall hold office until his death, incapacity, resignation, or removal. A person need not be a Member to be a Manager, but the dissociation of a Member who is also a Manager removes the person as a Manager. If a person who is both a Manager and a Member ceases to be a Manager, that cessation does not by itself dissociate the person as a Member. A Manager may resign upon thirty (30) days prior written notice to the Members. The Members may elect a new Manager to replace the resigning Manager at a meeting called for that purpose within thirty (30) days of delivery of the notice of resignation by such Manager. A Manager may be removed as a Manager at any time with or without cause by Company Vote.

3.02.   Officers.

(a)     The Manager may appoint himself or other individuals or entities (whether or not employees or Members of the Company) as officers of the Company, which may include, but shall not be limited to, any one or more of the following: a CEO, COO, a President, Vice President, a Secretary, and a Treasurer.

(b)     The Manager may delegate day-to-day management responsibilities to any such officers as determined by the Manager from time to time, to set the compensation of such officers, and such officers shall have the authority to contract for, negotiate on behalf of and otherwise represent the interests of the Company as so authorized by the Manager. Unless the Manager decides otherwise, if the title is one commonly used for officers of a corporation formed under the California General Corporation Law, the assignment of such title shall constitute the delegation to such individual of the authority and duties that are normally associated with that office and that are set forth in the contract or resolution appointing such officer or officers, subject, however, to any specific delegation of authority and duties or specific restriction on the authority and duties as may be made under or set forth in any such contract or resolution. In all events, the officers shall be subject to the direction and control of the Manager. Such delegation by the Manager shall not cause the Manager to cease to be a Member or Manager of the Company.

(c)     If the Manager determines to appoint one or more officers for the Company, each such officer shall hold office until his death, resignation, or removal. An officer may resign at any time by delivering notice to the Manager. A resignation is effective when the notice is delivered unless the notice specifies a later effective date. Any officer may be removed by the Manager at any time, with or without cause, but such right of removal shall be without prejudice to and subject to the contract rights, if any, of the person so removed.

3.03.   Fiduciary Duties. The Manager and officers owe to the Company and the Members the fiduciary duties of loyalty and care stated in subsections (a) and (b).

(a)     The duty of loyalty of a Manager or officer includes all of the following duties:

(1)     To account to the Company and to hold as trustee for it any property, profit, or benefit derived by the Manager or officer regarding any of the following:

(A)     In the conduct or winding up of the Company's activities;

(B)     From a use of the Company's property; and

(C)     From the appropriation of a Company opportunity.

(2)     To refrain from dealing with the Company in the conduct or winding up of the Company's activities as or on behalf of a person having an interest adverse to the Company.

(3)     To refrain from competing with the Company in the conduct of the Company's activities before the dissolution of the Company.

(b)     The duty of care of a Manager or officer in the conduct and winding up of

the Company's activities is to act with the care that a person in a like position would reasonably exercise under similar circumstances and in a manner the Manager reasonably believes to be in the best interests of the Company. A Manager or officer satisfies the duty of care under this subsection if all of the following apply:

(1)    The Manager or officer is not materially interested in the subject matter of the business judgment other than through his interest in the Company;

(2)    The Manager or officer is informed with respect to the subject of the business judgment to the extent the Manager or officer reasonably believes to be appropriate in the circumstances; and

(3)    The Manager or officer has a rational basis for believing that the business judgment is in the best interests of the Company.

(c)    A Manager or officer shall discharge his duties under this Agreement and exercise any rights consistently with the contractual obligation of good faith and fair dealing.

(d)    By Company Vote the Members may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty.

(e)    A Member does not have any fiduciary duty to the Company or to any other Member solely by reason of being a Member.

3.04.    <u>Manager and Officers Have No Exclusive Duty to Company</u>. So long as they do not violate the duty of loyalty described in section 3.03(a) above, neither the Manager nor an officer, solely by reason of being the Manager or an officer, shall be required to manage the Company as his sole and exclusive function, and the Manager or officer may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or officer or to the income or proceeds derived therefrom.

3.05.    <u>Statements of Information</u>. The Manager is authorized on behalf of the Company to deliver to the California Secretary of State for filing a Statement of Information, from time to time and as required by the Act. The statement may provide with respect to the Manager or any officer, the authority, or limitations on the authority, of all persons holding the position to do any of the following:

(a)    Execute an instrument transferring real property held in the name of the Company; and

(b)    Enter into other transactions on behalf of, or otherwise act for or bind, the Company.

3.06.    <u>Use of Professionals</u>. In exercising their powers, the Manager may rely upon and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, or document believed by them to be genuine and to have been signed or prepared by another Manager, Member, officer or employee of the Company, or by any other

person (including legal counsel, accountants, and other experts), as to matters the Manager reasonably believes such person is a competent and reliable source for the information. Reliance on any opinion of an independent counsel, accountant or expert whom the Manager reasonably believes is a competent and reliable source for the information shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the Manager in good faith and in accordance with such opinion.

3.07.   <u>Expenses and Salary</u>. The Manager shall be reimbursed by the Company for their reasonable expenses incurred in connection with the performance of their duties and may receive a guaranteed payment or such other compensation as determined by Company Vote from time to time.

3.08.   <u>Liability Limitation and Indemnification of the Manager and Officers</u>.

(a)   The Manager and officers shall not be personally liable to the Company or the Members for money damages for any action taken, or any failure to take any action, except liability for any of the following:

(1)   A breach of the duty of loyalty;

(2)   A financial benefit received by the Manager or officer to which the Manager or officer is not entitled;

(3)   An improper distribution under Section 4.05(b) of this Agreement;

(4)   Intentional infliction of harm on the Company or a Member; or

(5)   An intentional violation of criminal law.

(b)   The Manager and officers shall be defended, indemnified, and held harmless by the Company from and against any and all losses, claims, damages, liabilities, settlements and other amounts arising from any and all claims (including reasonable legal fees and expenses), demands, actions, suits or proceedings (civil, criminal, administrative or investigative), in which he or she may be involved, as a party or otherwise, by reason of his management of the Company, whether or not he or she continues to be Manager or officer at the time any such liability or expense is paid or incurred; provided that neither the Manager nor the officer shall be entitled to the foregoing indemnification if a court of competent jurisdiction determined that such losses, claims, damages, liabilities, expenses, or such other amounts resulted primarily from either his (1) gross negligence or willful misconduct or (2) a breach of his fiduciary duties set forth in § 3.03 of this Agreement. The termination of a proceeding by judgment, order, settlement or conviction upon a plea of *nolo contendere*, or its equivalent, shall not, of itself, create any presumption that such losses, claims, damages, liabilities, expenses, or such other amounts resulted primarily from the gross negligence or willful misconduct of the Manager or officer, or that the conduct giving rise to such liability was not in the best interest of the Company. The Company shall indemnify any Manager or officer who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Manager or officer is or was an agent of the Company, against any losses, claims, damages, liabilities, settlements, expenses, legal fees or any other amounts incurred by such Manager or officer in connection with the defense or settlement

of such action; provided that the Manager or officer shall not be entitled to the foregoing indemnification if a court of competent jurisdiction shall have determined that any such losses, claims, damages, liabilities, expenses or such other amounts resulted primarily from (1) the gross negligence or willful misconduct or (2) a breach of his fiduciary duties set forth in § 3.03 of this Agreement. The Company shall advance a Manager or officer any expenses (including, without limitation, reasonable legal fees and expenses) incurred as a result of any claim, demand, action, suit or proceeding referred to in this paragraph (b) provided that (1) the legal action, suit, etc. relates to the performance of duties or services by the Manager or officer on behalf of the Company; and (2) the Manager or officer gives a full recourse promissory note to the Company for the amounts of such advances payable in the event that the Manager or officer is determined to be not entitled to indemnification under this Agreement.

(c)     The indemnification provided by paragraph (b) of this Section 3.08 shall not be deemed to be exclusive of any other rights to which the Manager or officers may be entitled under any agreement, as a matter of law, in equity or otherwise, and shall continue as to the Manager or officers who have ceased to have an official capacity and shall inure to the benefit of the heirs, personal administrators, executors, successors and assigns of the Manager or officers.

(d)     Any indemnification pursuant to this section will be payable only from the assets of the Company.

(e)     The Company may purchase and maintain insurance on behalf of a Member or the Manager against liability asserted against or incurred by the Member or the Manager in that capacity or arising from that status.

## ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS

4.01.   Capital Accounts.

(a)     A capital account (a "**Capital Account**") shall be established for each Member.

(1)     Each Capital Account will be increased by:

(A)     the amount of money contributed by such Member to the Company;

(B)     the Gross Asset Value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and

(B)     the Net Profits allocated to the Member.

(2)     Each Capital Account will be decreased by:

(A)     the amount of money or, to the extent permissible under Treasury Regulations § 1.704-1(b)(2)(iv)(e)(2), notes distributed to such Member by the Company;

(B)     the Gross Asset Value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under § 752 of the Code); and

(C)     the amount of Net Losses allocated to such Member.

(b)     In the event a Member transfers a Transferable Interest, the Capital Account associated with such transfer shall become the Capital Account of the Transferee to the extent it relates to the Transferable Interest.

(c)     The manner in which Capital Accounts are to be maintained pursuant to this Section 4.01 is intended, and shall be construed, so as to comply with the requirements of § 704(b) of the Code and the Treasury Regulations, and in the event there exists any inconsistency, the Code and the Treasury Regulations shall control.

4.02.    <u>Allocation of Net Profits and Net Losses</u>. Except as provided elsewhere in this Article IV or as otherwise required by law, the Net Profits and Net Losses of the Company for each Fiscal Year shall be allocated among the Members as follows:

(a)     Pro rata as to Patrick Burgess based on the number of Membership Units held in accordance with Section 2.01 of this Agreement; and

(b)     thereafter split into equal shares between Tim Wobig and The Lurie Family Trust.

4.03.    <u>Regulatory Allocations</u>. The Capital Accounts of the Members are to be maintained in accordance with the Code and the Treasury Regulations, including without limitation the alternative test for economic effect set forth in Treasury Regulations § 1.704-1(b)(2)(ii)(d) and the minimum gain chargeback provisions of Treasury Regulations § 1.704-2, but nothing in this Agreement is intended to create a deficit restoration obligation or otherwise impose personal liability on a Member for a deficit in his Capital Account. Without limiting the generality of the foregoing:

(a)     <u>Qualified Income Offset</u>. If any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(d)(4), (5), or (6), which create or increase a deficit in its Adjusted Capital Account, then items of the Company's income and gain for such year and, if necessary, for subsequent years shall be specially credited to the Adjusted Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit in the Adjusted Capital Account as quickly as possible, provided that an allocation pursuant to this Section 4.03(a) shall be made only if and to the extent that such Member would have a deficit Adjusted Capital Account after all other allocations provided for in this Section 4.03 have been made as if Section 4.03(a) were not in this Agreement. It is the intent that this section be interpreted to comply with the alternate test for economic effect set forth in Treasury Regulations § 1.704-1(b)(2)(ii)(d).

(b)     In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of: (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, if any, and (ii) the amount such Member is deemed

to be obligated to restore pursuant to the penultimate sentences of §§ 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.03(b) shall be made only if and to the extent that such Member would have a deficit Adjusted Capital Account in excess of such sum after all other allocations provided for in this Section 4.03 have been made as if Section 4.03(a) and this Section 4.03(b) were not in this Agreement.

(c)     Except as otherwise provided in § 1.704-2(f) of the Treasury Regulations, and notwithstanding any other provision of this subsection, if there is a net decrease in partnership minimum gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulation § 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with §§ 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This subsection is intended to comply with the minimum gain chargeback requirement in § 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(d)     Except as otherwise provided in § 1.704-2(i)(4) of the Treasury Regulations, and notwithstanding any other provision of this subsection, if there is a net decrease in partner nonrecourse debt minimum gain attributable to a partner nonrecourse debt during any Fiscal Year, each Member who has a share of the partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with § 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Treasury Regulation § 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with §§ 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section is intended to comply with the minimum gain chargeback requirement in § 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(e)     Nonrecourse deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their respective Transferable Interest in the Company.

(f)     Any partner nonrecourse deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the partner nonrecourse debt to which such partner nonrecourse deductions are attributable in accordance with Treasury Regulation § 1.704-2(i)(1).

(g)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code § 734(b) or Code § 743(b) is required, pursuant to Treasury Regulation § 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Member in a manner consistent with the manner in which their Capital

Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(h)     Notwithstanding the provisions of Section 4.02, the Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss and deduction among the Members so that, to the extent possible, without violating the requirements giving rise to the Regulatory Allocations, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred. For purposes of applying the foregoing sentence, allocations pursuant to this subsection (h) shall only be made with respect to allocations pursuant to subsection (g) hereof to the extent the Manager reasonably determines that such allocations will otherwise be inconsistent with the economic agreement among the Members.

(i)     The Manager shall have reasonable discretion, with respect to each Fiscal Year, to (i) apply the provisions of subsection (h) hereof in whatever order is likely to minimize the economic distortions that might otherwise result from the Regulatory Allocations, and (ii) divide all allocations pursuant to subsection (h) hereof among the Members in a manner that is likely to minimize such economic distortions.

(j)     In the event that any debt of the Company is properly characterized as equity for U.S. federal income tax purposes, the holder of such debt shall be treated for purposes of maintaining Capital Accounts and for U.S. federal income tax purposes as a "partner"; Net Profit and Net Loss shall be computed without deducting any amount that would have been treated as interest if the debt had been properly classified as "debt" for U.S. federal income tax purposes; and the amount that otherwise would have been so deducted shall instead be specially allocated to holder of such recharacterized debt.

4.04.    <u>Tax Allocations</u>. The Company's net taxable income or loss (and each item of income, gain, loss or deduction comprising such net taxable income or loss), as determined for federal income tax purposes, shall be allocated among the Members in the same proportions as the corresponding items of "book" income, gain, loss and deduction are allocated pursuant to Sections 4.02 and 4.03 hereof. Notwithstanding the foregoing sentence, federal income tax items relating to (a) any property contributed to the Company if there was as of immediately following the contribution a difference between the Gross Asset Value of such property and the Company's adjusted tax basis in such property and (b) any property revalued pursuant to Section 10.09(d) of this Agreement if as of immediately following such revaluation there was a difference between the Gross Asset Value of such property and the Company's adjusted tax basis in such property, shall be allocated among the Members in accordance with § 704(c) of the Code and Treasury Regulations §§ 1.704-1(b)(2)(iv)(f) and (g), 1.704-1(b)(4)(i) and 1.704-3 to take into account the difference between the Gross Asset Value and the adjusted tax basis of such property.

4.05.    Distribution of Cash and Other Property.

(a)     <u>Nonliquidating Distributions</u>. After establishing reserves for current and future Company obligations (as determined in the reasonable discretion of the Manager), and such other Company investments and expenditures as determined by the Manager, money and other property available for distribution may, as determined by the Manager, be distributed from time to time to the Members. Any such distributions made by the Company before its dissolution and winding up shall be allocated among the Members pro rata based on the number of Membership Units held in accordance with Section 2.01 of this Agreement, except to the extent necessary to

comply with any charging order in effect under California law.

Other than as provided above, a person does not have a right to a distribution. A Member's dissociation does not entitle the Member to a distribution.

A Member does not have a right to demand or receive a distribution from the Company in any form other than money. The Company may distribute an asset in kind if each part of the asset is fungible with each other part and each Member receives a percentage of the asset equal in value to the Member's share of distributions. Distributed assets shall be valued at their Gross Asset Value for purposes of the distribution and shall be treated for financial accounting purposes as if sold at their Gross Asset Value immediately prior to the distribution, with any resulting profits or losses allocated among the Members per their interests in such profits or losses.

If a Member or Transferee becomes entitled to receive a distribution, the Member or Transferee has the status of, and is entitled to all remedies available to, a creditor of the Company with respect to the distribution. The Company's indebtedness to a Member incurred by reason of a distribution made in accordance with this section is at parity with the Company's indebtedness to its general, unsecured creditors.

(b)    Limitation upon Distributions. The Company shall not make a distribution if after the distribution any of the following applies:

(1)    The Company would not be able to pay its debts as they become due in the ordinary course of the Company's activities;

(2)    The Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved, wound up, and terminated at the time of the distribution, to satisfy the preferential rights upon dissolution, winding up, and termination of Members whose preferential rights are superior to those of persons receiving the distribution; or

(3)    The payment of the distribution would be a default by the Company under any agreement for borrowed money by the Company, whether after notice, lapse of time or otherwise.

(c)    The Company may base a determination that a distribution is not prohibited under subsection (b) on financial statements prepared on the basis of accounting practices and principles that are reasonable in the circumstances or on a fair valuation or other method that is reasonable under the circumstances.

(d)    Except as otherwise provided in subsection (f), the effect of a distribution under subsection (b) is measured as follows:

(1)    In the case of a distribution by purchase, redemption, or other acquisition of a Transferable Interest in the Company, as of the date money or other property is transferred or debt incurred by the Company.

(2)    In all other cases, as follows:

(A)    The date that distribution is authorized, if the payment

occurs within one hundred twenty (120) days after that date.

(B)    The date that payment is made, if the payment occurs more than one hundred twenty (120) days after the distribution is authorized.

(e)    The Company's indebtedness, including indebtedness issued in connection with or as part of a distribution, is not a liability for purposes of subsection (b) if the terms of the indebtedness provide that payment of principal and interest are made only to the extent that a distribution could be made to Members under this section. If indebtedness is issued as a distribution, each payment of principal or interest on the indebtedness is treated as a distribution, the effect of which is measured on the date the payment is made.

(f)    In subsection (b) "distribution" does not include amounts constituting reasonable compensation for present or past services or reasonable payments made in the ordinary course of business under a bona fide retirement plan or other benefits program.

## ARTICLE V TRANSFER OF TRANSFERABLE INTERESTS; NEW MEMBERS

5.01.    <u>General Prohibition</u>.    Unless otherwise required by law, except as expressly permitted herein, no Member may sell, assign, pledge, hypothecate or otherwise transfer or encumber all or any part of their Transferable Interest in the Company prior to a Company Vote in the affirmative; provided, however, that the foregoing shall not apply to any transaction involving some or all of a Member's Transferable Interest either between Members or to the Company.

5.02.    <u>Transferable Interest</u>. A Transferable Interest is personal property. Subject to the terms of Sections 5.01 (General Prohibition) and 5.03 (Right of First Refusal), a Member may transfer his Transferable Interest, in whole or in part. The transfer:

(a)    Does not cause a Member's dissociation or a dissolution and winding up of the Company's activities;

(b)    Does not entitle the Transferee to do any of the following:

(1)    Participate in the management or conduct of the Company's activities; or

(2)    Except as otherwise provided in subsection (h), have access to records or other information concerning the Company's activities.

(c)    A Transferee has the right to receive, in accordance with the transfer, distributions to which the Member would otherwise be entitled.

(d)    In a dissolution and winding up of the Company, a Transferee is entitled to an account of the Company's transactions only from the date of dissolution.

(e)    The Company need not give effect to a Transferee's rights under this article until the Company has notice of the transfer.

(f)     Unless expelled by Company Vote of the other Members or until the Transferee becomes a Member, a Member who transfers his entire Transferable Interest retains the rights of a Member, other than the interest in distributions transferred, and retains all duties and obligations of a Member.

(g)     When a Member transfers a Transferable Interest to a person who becomes a Member with respect to the transferred interest, the Transferee is liable for the Member's obligations to make his Capital Contribution under the terms of this Agreement and for receipt of any improper distributions, known to the Transferee when the Transferee becomes a Member.

(h)     If a Member dies, the deceased Member's personal representative or other legal representative may exercise the rights of a current Member under the Act for the purposes of settling the estate.

5.03.   <u>Right of First Refusal</u>.  Other than a transfer by a deceased's representative under Section 5.02(h) or as otherwise barred by law, if a Member shall propose to sell, assign, or otherwise transfer all or any part of their Transferable Interest to a non-Member, such Member ("Selling Member") shall first give notice to the Manager and other Members (together with the Company, the "Offerees") of the proposed terms of such transaction, including the identity of the proposed purchaser, assignee, or transferee and the net price to be received (the "Net Price"), so that the Offerees may first purchase the Transferable Interest ("Right of First Refusal").

(a)     If the sale, assignment, or transfer shall be for a Net Price other than an agreed and stated value in cash, the Selling Member's Transferable Interest that is subject of the transaction shall be appraised by an appraiser to be chosen by agreement of the Selling Member and the Offerees.  In the absence of an agreement on an appraiser between the Selling Member and the Offerees, the Manager shall choose an appraiser to perform the appraisal.  The lower of the Net Price or the value set by the appraiser, less in each case any outstanding obligations of the Selling Member to the company as well as their pro rata share of liens, encumbrances or liabilities of the Company, shall be the price offered to the Offerees.

(b)     The Offerees, within thirty (30) days upon the later of receipt of the notice or the determination of the Net Price shall, in writing, either:  (i) accept the offer to purchase the Selling Member's Transferable Interest for the price provided therefore; or (ii) reject the offer.  If the Offerees do not respond within the 30-day period herein provided, the Selling Member may transfer his, her or its Transferable Interest to the identified proposed purchaser, assignee, or transferee subject to the terms of this Agreement and otherwise on the terms and conditions and at the Net Price specified in the notice and upon the execution by the proposed purchaser, assignee, or transferee of this Agreement.

(c)     If one or more Offerees elect to purchase the Selling Owner's Transferable Interest, the Company shall have the first right to purchase said Transferable Interest up to the extent it has chosen to do so, and the remaining Offerees shall have the right to purchase the remaining Transferable Interest of the Selling Owner.  To the extent it is necessary to apportion the Transferable Interest to be sold among the remaining Offerees, the remaining Offerees wishing to purchase the Transferable Interest shall each have the right to purchase pro rata in proportion to their then current Membership Units in the Company.

5.04.   <u>Mandatory Buyout</u>.  Any Member or Transferee owning less than a majority of the

Membership Units ("Exercising Seller") shall have the right and option to force the Company to purchase all of the Membership Units held by such Exercising Seller under the following terms and conditions ("Put Option").

(a)     The Put Option shall be first applicable to an Exercising Member upon the earlier of:  (i) notice by the Company to the Exercising Seller pursuant to Section 3.01(b) of the final rejection by the Company of a bona fide offer from a third party to purchase the Company or all or substantially all of the Company's assets; (ii) the death, divorce, dissolution, or planned divorce or dissolution of such Exercising Seller; or (iii) the five-year anniversary from the date of formation of the Company.

(b)     Such Exercising Seller (or his, her, or its representative) seeking to exercise such Put Option shall transmit written notice ("Exercise Date") to the Company of the exercise of the Put Option.

(c)     If such Exercise Date occurs within sixty (60) days of notice to the Exercising Seller pursuant to Section 3.01(b) of the final rejection of a bona fide offer from a third party to purchase the Company or all or substantially all of the Company's assets:

(1)     The purchase price shall be determined by multiplying the amount of the bona fide offer from such third party by the number of Membership Units held in accordance with Section 2.01 of this Agreement divided by the total number of Membership Units, with the sum multiplied by one hundred ten percent (110%) ("Seller's Premium") to achieve a ten percent (10%) premium, which the Members agree is a reasonable estimate of the value for the consolidation of ownership of the Company.

(2)     Notwithstanding anything to the contrary, should the Manager fail to provide timely notice to the Exercising Seller pursuant to Section 3.01(b) of the final rejection of a bona fide offer from a third party to purchase the Company or all or substantially all of the Company's assets, the purchase price shall be the higher of:  (i) formula described in subsection (c) immediately above, provided, however, that the Seller's Premium shall be increased from one hundred ten percent (110%) to two hundred fifty percent (250%); or (ii) the formula described in subsection (d) immediately below.

(d)     In all other cases, the purchase price for the Membership Units shall be the balance of the Exercising Seller's Capital Account as of the date that notice of the exercise of the Put Option is transmitted to the Company ("Exercise Date") adjusted as follows:

(1)     The Exercising Seller's Capital Account shall be adjusted to reflect the Exercising Seller's share of the Profits and Losses up to the Exercise Date.

(2)     The Exercising Seller's Capital Account shall further be adjusted to reflect the Exercising Seller's share of the Profits and Losses of a deemed sale of all property of the Company, which shall be deemed to take place on the Exercise Date, and the purchase price of which is determined as follows:

(A)     The fair market value of the Company's tangible personal property shall be the amount shown for such properties on the Company's books.

(B)    The fair market value of the Company's intangible personal property and real property shall be either the "agreed value" or the "appraised value," each as hereinafter described:

(I)    Within ten (10) days of the Exercise Date, the Manager shall transmit to the Exercising Seller (or its representative) the value and the method of calculation used to determine the proposed fair market value for each item of the Company's intangible personal property and real property ("Proposed Value").

(II)    The Exercising Seller shall thereupon have fourteen (14) days from the effective date of the notice to accept or reject the Proposed Value. If the Exercising Seller does not notify the Company of his, her or its rejection within such fourteen (14) day period, the Exercising Seller shall be deemed to have accepted the Proposed Value.

(III)    In the event the Exercising Seller rejects the Proposed Value, the fair market value of the Company's intangible personal property and real property shall be determined by appraisal. The Exercising Seller and the Manager shall jointly appoint an appraiser, or failing this joint action, shall each separately designate an appraiser. If two appraisers are designated and they concur on the value of the Company's intangible personal property and real property, the value determined by them shall be the value of the Company's intangible personal property and real property. If the appraisers do not concur, and the difference between the higher and lower appraisal is an amount that is less than twenty percent (20%) of the amount of the higher appraisal, the mean average of the two appraisals shall be the value of the Company's intangible personal property and real property. If the difference between appraisals exceeds the amount specified above, the two appraisers shall jointly appoint a third appraiser, or failing this joint action, JAMS shall select the third appraiser. The third appraiser shall choose the one of the two appraised values that he, she, or it determines is closer to its fair market value, and the appraised value so chosen shall be the value of the Company's intangible personal property and real property.

(C)    The value established under this Section shall be binding and conclusive on the parties. Each party shall be responsible for the costs of its own appraiser and half the cost of a shared appraiser, if necessary.

## ARTICLE VI VOTING, QUORUM, AND MEETINGS OF MEMBERS

6.01.    <u>Voting Rights</u>. Each Member shall be entitled to vote their respective Voting Interest unless otherwise required by law or this Agreement.

6.02.    <u>Meetings</u>. Meetings of the Members may be called from time to time by the Manager or by Members representing a majority of the Voting Interest. A difference arising among Members as to matters upon which the Members are required or permitted to take action shall be decided by Company Vote.

6.03.    <u>Place of Meetings</u>. The Manager may designate any place as the place of any Member meeting. If the Manager do not designate the place for a Member meeting, the Member meeting shall be held at the Company's principal office.

6.04.  <u>Notice</u>. Written notice indicating the date, time, place, and purpose of all Member meetings shall be delivered to each Member not less than ten (10) days before the date of the meeting.

6.05.  <u>Meeting of All Members</u>. Subject to Section 6.12, if every Member is present at any meeting, even without notice, such meeting shall be valid and Members may take any action required or permitted to be taken at a Member meeting.

6.06.  <u>Record Date</u>. The record date for purposes of determining the Members entitled to notice of or to vote at any Member meeting shall be the date on which the notice is mailed.

6.07.  <u>Quorum</u>. Members represented in person or by proxy and constituting, in the aggregate, a majority of the Voting Interest shall constitute a quorum for purposes of transacting business at a meeting of the Members.

6.08.  <u>Proxies</u>. A Member may vote in person or by proxy, provided any proxy is executed in writing by the Member. Any such proxy must be filed with the Manager before or at the time of the meeting. No proxy shall be valid six months after its execution.

6.09.  <u>Action by Members Without a Meeting</u>. Any action required or permitted to be taken at a Member meeting may be taken without a meeting and without notice if the action is taken by Members having or representing not less than the minimum Voting Interest that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote thereon were present and voted. The record date for determining which Members may take action without a meeting shall be the date the first Member signs a written consent. Action taken under this Section shall be effective as of the date the first Member signs a written consent, unless the consent specifies a different effective date.

6.10.  <u>Participation By Other Means</u>. Members may participate in any Member meeting by any means of communication method that allows all Members participating therein to simultaneously hear each other. Participating in such a meeting shall constitute attendance at such meeting.

6.11.  <u>Member Representative</u>. Any non-individual Member shall designate one individual to act as the exclusive representative of the Member for all purposes related to the Company, including, without limitation, for purposes of participation of the Member in all Member meetings, the voting by the Member and the execution of any written consent evidencing action of the Members taken without a meeting. A Member may change the identity of the Member's representative at any time and from time to time, in the Member's sole discretion, but shall provide written notice thereof to the Manager.

6.12.  <u>Waiver</u>.

(a)  A Member may waive any notice required by this Agreement before or after the date and time stated in the notice. The waiver must be in writing, be signed by the Member entitled to the notice, and be delivered to the Manager.

(b)  A Member's attendance at a meeting:

(i)  waives objection to lack of notice or defective notice of the meeting,

unless the Member at the beginning of the meeting or promptly upon the Member's arrival objects to holding the meeting or transacting business at the meeting; and

(ii) waives objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

## ARTICLE VII DISSOCIATION

7.01.    <u>Dissociation Events</u>. A Member is dissociated from the Company when one or more of the following events occur:

(a)    The Company has actual notice of the Member's express will to dissociate, but, if the Member specified a withdrawal date later than the date the Company received actual notice, on that later date;

(b)    The Member is expelled from the Company pursuant to Section 7.04;

(c)    On application by the Company, the Member is expelled as a Member by judicial order because the Member:

(1)    Has engaged, or is engaging in, wrongful conduct that has adversely and materially affected, or will adversely and materially affect, the Company's activities;

(2)    Has willfully or persistently committed, or is willfully and persistently committing, a material breach of this Agreement; or

(3)    Has engaged in, or is engaging, in conduct relating to Company's activities which makes it not reasonably practicable to carry on the activities with the Member associated with Company;

(d)    In the case of a Member who is an individual, the person dies;

(e)    In the case of a person who is a trust or is acting as a Member by virtue of being a trustee of a trust, the trust's entire Transferable Interest in the Company is distributed;

(f)    In the case of a person who is an estate or is acting as a Member by virtue of being a personal representative of an estate, the estate's entire Transferable Interest in the Company is distributed;

(g)    In the case of a Member who is not an individual, partnership, limited liability company, corporation, trust, or estate, the termination of the Member;

(h)    The Company participates in a merger and the Company is not the surviving entity or as a result of the merger the Member ceases to be a Member;

(i)    The Company participates in a conversion under the Act; or

(j)    The Company terminates.

7.02.    <u>Wrongful Dissociation</u>. A Member who wrongfully dissociates from the Company is liable to the Company and, subject to the Act, to the other Members for damages caused by the dissociation. The liability is in addition to any other debt, obligation, or other liability of the Member to the Company or other Members. The Member's dissociation from the Company is wrongful if the dissociation occurs before the termination of Company and any of the following apply:

(a)    The Member withdraws by express will;

(b)    The Member is expelled by judicial order pursuant to Section 7.01(c);

(c)    In the case of a Member who is not a trust other than a business trust, an estate, or an individual, the Member is expelled or otherwise dissociated as a Member because it willfully dissolved or terminated; or

(d)    The Member attempts to sell, assign, pledge, hypothecate or otherwise transfer or encumber all or any part of their Transferable Interest in a manner that violates or attempts to violate the provisions of Article V (Transfer of Transferable Interest).

7.03.    <u>Effect of Dissociation</u>. A Member's dissociation from the Company does not of itself discharge the person from any debt, obligation, or other liability to the Company or other Members, which the dissociated Member incurred while a Member. When a Member dissociates from Company:

(a)    The person's right to participate as a Member in the management and conduct of Company's activities terminates; and

(b)    Subject to the Act and the terms of any merger, conversion or domestication to which the Company is a party, any Transferable Interest owned by the person immediately before dissociation in the person's capacity as Member is owned by the person solely as a Transferee.

7.04.    <u>Expulsion</u>. Without limiting any other rights of the Company, including without limitation the right to apply for expulsion under Section 7.01, a Member may be expelled by Company Vote of the other Members if:

(a)    It is unlawful to carry on the Company's activities with the Member associated with Company;

(b)    There has been a transfer of all of the Member's Transferable Interest in the Company, other than a transfer for security purposes or a charging order in effect which has not been released or satisfied within sixty (60) days;

(c)    Such Member is a corporation and, within 90 days after the Company notifies Member that it will be expelled as a Member because Member has filed a certificate of dissolution or the equivalent, its articles or charter has been revoked, or its right to conduct business has been suspended by the jurisdiction of its incorporation, the certificate of dissolution has not been revoked or its articles or charter or right to conduct business has not been reinstated;

(d)    Such Member is a limited liability company or partnership that has been dissolved and whose business is being wound up; or

(e)    Such Member fails to make a required Capital Contribution and has not cured such breach within fourteen (14) days following written notice thereof by the Company to such Member; or

(f)    Such Member has materially breached or threatened to materially breach either any duties to the Company or any term, covenant, or condition of this Agreement or any other written and signed agreement with the Company and has not cured such breach within fourteen (14) days following written notice thereof by the Company to such Member.

## ARTICLE VIII RECORDS; FINANCIAL AND FISCAL AFFAIRS; TAX REPORTING

8.01.    <u>Records and Accounting</u>.

(a)    The books of account of the Company shall be maintained at the Company's principal office. The Company shall maintain correct and proper books and records, entering fully and properly all Company transactions, as reasonably determined by the Manager.

(b)    Upon request, for any purpose reasonably related to the Member's interest as a Member, the Manager will furnish a copy of such information as is required by the Act to a Member or his, her, or its representative; provided, however, that the information furnished to the Member will not, in any event, be used for commercial purposes unrelated to the business operations of the Company. Any Member may inspect and copy or obtain from the Manager the financial records of the Company and its tax returns. A Member shall give the Manager at least five (5) business days prior written notice for any inspection and copying permitted pursuant to this subsection by the Member or its authorized attorney or agent.

8.02.    <u>Tax Information</u>. The Manager will cause to be delivered, as soon as practical after the end of each Fiscal Year of the Company, to the Members and persons who were Members during such Fiscal Year (as well as to all persons treated as partners for U.S. federal income tax purposes) all information concerning the Company necessary to enable such Member or other person to prepare his, her, or its Federal and state income tax returns for such Fiscal Year, including a statement indicating such person's share of Net Profits, Net Losses, deductions, and credits for such Fiscal Year for Federal and state income tax purposes, and the amount of any distribution made to or for the account of such person during such Fiscal Year pursuant to this Agreement.

8.03.    <u>Tax Returns</u>. The Manager shall cause income tax returns for the Company to be prepared and timely filed in accordance with applicable law.

8.04.    <u>Elections</u>.

(a)    The Manager may elect to adjust the basis of the Company assets for federal income tax purposes in accordance with § 754 of the Code in the event of a distribution of Company property as described in § 734 of the Code or a transfer by any Member as described in § 743 of the Code.

(b)    The Manager, in his discretion, at any time and from time to time may also make such other tax elections as he or she deems necessary or desirable.

8.05.    <u>Interim Closing of the Books</u>. There shall be an interim closing of the books of account of the Company:

(a)    at any time a taxable year of the Company shall end pursuant to the Code; and

(b)    at any other time determined by the Manager to be required by good accounting practice or otherwise appropriate under the circumstances.

8.06.    <u>Tax Matters Partner</u>. The Manager shall be the "Tax Matters Partner" within the meaning of Code § 6231(a)(7) and is authorized to exercise the functions of a Tax Matters Partner under the Code. The Manager shall be reimbursed for all reasonable expenses associated with its duties as Tax Matters Partner.

## ARTICLE IX DISSOLUTION

9.01.    <u>Events Causing Dissolution</u>. The Company is dissolved, and its activities must be wound up, upon the occurrence of any of the following:

(a)    the consent of all the Members;

(b)    the passage of ninety (90) consecutive days during which the Company has no Members;

(c)    on application by a Member, the entry by a court of competent jurisdiction an order dissolving the Company on the grounds that:

(1)    the conduct of all or substantially all of the Company's activities is unlawful;

(2)    it is not reasonably practicable to carry on the Company's activities in conformity with its Certificate and this Agreement; or

(3)    the Manager has, or has knowingly countenanced, persistent and pervasive fraud, mismanagement, or abuse of authority.  In a proceeding brought under this subsection (3), the court may order a remedy other than dissolution.

9.02.    <u>Distribution of Assets in Winding Up Company</u>.

(a)    In winding up its activities, the Company must apply its assets to discharge its obligations to creditors, including Members who are creditors.

(b)    After the Company complies with subsection (a), any surplus must be distributed in the following order:

(1)    to each person owning a Transferable Interest that reflects Capital Contributions made by a Member and not previously returned, an amount equal to the value of the unreturned Capital Contributions; and

(2)    in equal shares to each person owning a Transferable Interest.

(c)    If the Company does not have sufficient surplus to comply with subsection (b)(1), any surplus must be distributed among the owners of Transferable Interests in proportion to the value of their respective unreturned Capital Contributions.

(d)    All distributions made under subsections (b) and (c) must be paid in money.

9.03.    Business After Dissolution. After dissolution, the Company shall not engage in any business except that necessary to wind up the Company's affairs pursuant to the Act and to protect the value of and distribute the Company's assets.

9.04.    Net Profits and Net Losses During Winding Up. Net Profits and Net Losses earned or incurred during the course of the winding up of the Company shall be credited or debited to the Members in the same proportion as before dissolution.

9.05.    Management of the Company After Dissolution. The Manager shall continue to manage the Company after dissolution.

9.06.    Winding Up. Upon dissolution each Member shall look solely to the assets of the Company for the return of its Capital Account. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return to the Capital Account of each Member, such Member shall have no recourse against other Members, in their capacity as such. Further, no Member shall be required to restore any deficit in his Capital Account and such deficit shall not be treated as an asset of the Company. The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Manager, who is hereby authorized to take all actions necessary to accomplish such distribution, including without limitation, selling any Company assets the Manager deem necessary or appropriate to sell.

## ARTICLE X DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

10.01.  "Act" shall mean the California Revised Uniform Limited Liability Company Act, California Corporations Code §§17701.01 to 17713.13, as amended from time to time.

10.02.  "Adjusted Capital Account" shall mean, with respect to each Member, the Member's Capital Account as adjusted by the items described in §§ 1.704-2(g)(1), 1.704-2(i)(5) and 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

10.03.  "Agreement" shall mean this Operating Agreement, as originally executed or as amended, modified, supplemented or restated from time to time.

10.04.  "Capital Account" shall have the meaning ascribed to it in Section 4.01 of this

Agreement.

10.05.  "Capital Contribution" shall mean in the case of any Member as of any date of determination, the aggregate amount of cash and fair market value of any non-cash property (net of any liabilities assumed by the Company or secured by such property) that such Member shall be credited with contributing, directly or by assignment, to the Company on or prior to such date.

10.06.  "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time and any successor statute or subsequent codification or recodification of the federal income tax laws of the United States.

10.07.  "Company" shall mean Wobig LLC, as such limited liability company may from time to time be constituted.

10.08.  "Company Vote" shall mean the affirmative vote of seventy-five percent (75%) or more of the Voting Interest unless otherwise required by law or this Agreement.

10.09.  "Fiscal Year" shall mean the twelve (12)-month period ending December 31.

10.10.  "Gross Asset Value" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)  The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Manager;

(b)  The Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, upon any of the following events:

(1)  the contribution of more than *de minimus* additional capital by any new Member or existing Member;

(2)  the distribution by the Company to a Member of more than a *de minimus* amount of property as consideration for the Member's Capital Contribution; or

(3)  the liquidation of the Company within the meaning of § 1.704-1(b)(2)(ii)(g) of the Treasury Regulations; provided, however, that adjustments pursuant to the preceding clauses (1) and (2) shall be made only if the Manager determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members;

(c)  The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution, as determined by the Manager; and

(d)  The Gross Asset Values of Company assets shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted basis of such assets pursuant to § 734(b) or § 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to § 1.704-1(b)(2)(iv)(m) of the Treasury Regulations; provided, however, that Gross Asset Values shall not be adjusted pursuant to clause (d) to the extent that the Manager determines that an adjustment pursuant to this clause (d) is not necessary

or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d). If the Gross Asset Value of an asset has been determined or adjusted pursuant to of this Agreement, such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

10.11. "Manager" shall mean the person appointed pursuant to Section 3.01, which shall initially be Marc Lurie, subject to any future Company Vote.

10.12. "Member" shall mean a person who at any given time is a Member of the Company.

10.13. "Membership Units" shall mean, individually, the number of ownership units held by each respective Member and, collectively, the total number of outstanding ownership units as set forth in Section 2.01 as amended from time to time.

10.14. "Net Profits" shall mean, for each Fiscal Year, the net taxable income of the Company determined in accordance with the income tax basis method of accounting and as reported, separately and in the aggregate, as appropriate, on the Company's information return filed for United States federal income tax purposes, less any expenditures not deductible in computing the Company's taxable income and not properly chargeable to capital account under § 705(a)(2)(B) of the Code plus any tax-exempt income of the Company; adjusted in the event that the Gross Asset Value of any asset differs from its adjusted tax basis to compute gain or loss and depreciation or amortization in respect of such property by reference to such Gross Asset Value; and adjusted, in the event that any asset is revalued pursuant to Section 10.09(b) or (d), to include as gain or loss the net increase or decrease in the Gross Asset Value of the asset.

10.15. "Net Losses" shall mean, for each Fiscal Year, the net taxable loss of the Company determined in accordance with the income tax basis method of accounting and as reported, separately and in the aggregate, as appropriate, on the Company's information return filed for United States federal income tax purposes, plus any expenditures not deductible in computing the Company's taxable income and not properly chargeable to capital account under § 705(a)(2)(B) of the Code less any tax-exempt income of the Company; adjusted in the event that the Gross Asset Value of any asset differs from its adjusted tax basis to compute gain or loss and depreciation or amortization in respect of such property by reference to such Gross Asset Value; and adjusted, in the event that any asset is revalued pursuant to Section 10.09(b) or (d), to include as gain or loss the net increase or decrease in the Gross Asset Value of the asset.

10.16. "Regulatory Allocations" shall mean the allocations pursuant to Section 4.03(a) through (i) of this Agreement.

10.17. "Patents and Patent Applications" shall mean all utility and design patents and patent applications related to the Company's current and future products including, but not limited to, U.S. Pat. Apps. 63,399,903 and 18/236,762, U.S. Des. Pat. App. 29/857,465, and all subsidiary or related utility and design patent applications.

10.18. "Transferable Interest" shall mean the Membership Units and any right, as originally associated with a person's capacity as a Member, to receive distributions from the Company in accordance with this Agreement, whether or not the person remains a Member or continues to own any part of the right.

10.18.  "Transferee" shall mean a person to which all or part of a Transferable Interest has been transferred, whether or not the transferor is a Member.

10.19.  "Treasury Regulations" shall mean the regulations of the United States Department of the Treasury pertaining to the income tax, as from time to time in force.

10.20.  "Voting Interest" shall mean the total number of Voting Units associated with the Members in Section 2.01 of this Agreement and specifically excludes any and all Transferable Interests held by Transferees.

## ARTICLE XI MISCELLANEOUS

11.01. <u>Notices</u>. Any notice, offer, consent or other communication required or permitted to be given or made hereunder shall be in writing and will be deemed to have been sufficiently delivered:

(a)    three business days after the date mailed by certified mail, return receipt requested, postage prepaid;

(b)    when delivered by a nationally recognized overnight delivery service (receipt requested);

(c)    when delivered personally to the party (or an officer of the party) to whom the same is directed; or

(d)    when the electronic transmission of electronic mail is successfully completed:

If to Patrick Burgess:                    If to Tim Wobig:

Patrick Burgess                           Tim Wobig
1006 Columbine Rd.                        19557 Molly St Unit B
Asheville NC 28803                        Elkhorn NE 68022-6550
patrick@pbrworks.com                      timwobig @gmail.com

If to The Lurie Family Trust:

The Lurie Family Trust
Attn:  Marc Lurie, Co-Trustee
2950 Windtree Ct
Lafayette CA 94549
marclurie@me.com

11.02. <u>Possible Restrictions</u>. Notwithstanding anything to the contrary contained in this Agreement, the Manager may impose such restrictions as may be required, in the opinion of counsel, to prevent the Company for Federal income tax purposes from being taxed as an association taxable as a corporation or otherwise as an entity, including, without limitation, making any amendments to this Agreement as the Manager in his sole discretion may determine to be necessary or appropriate to impose such restrictions in the event of:

(a)     the enactment (or imminent enactment) of any legislation;

(b)     the publication of any temporary or final regulation by the United States Department of the Treasury;

(c)     any ruling by the Internal Revenue Service, or

(d)     any judicial decision that, in any such case, in the opinion of counsel for the Company, would result in the taxation of the Company as an association taxable as a corporation or would otherwise result in the Company being taxed as an entity for federal income tax purposes.

11.03.   <u>Governing Law; Successors</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of California and, subject to the restrictions on transferability set forth in this Agreement, shall bind and inure to the benefit of the heirs, executors, personal representatives, successors and assigns of the Members. The rights and liabilities of the Members under this Agreement shall be as provided by California law.

11.04.   <u>Entire Agreement</u>. This Agreement is the sole operating agreement of the Company and constitutes the entire agreement among the parties relating to its subject matter; this Agreement supersedes any prior agreements or understandings between the parties, oral or written relating to its subject matter, all of which are hereby canceled. This Agreement may not be modified or amended except by a Company Vote.

11.05.   <u>Headings, etc</u>. The Article and Section headings in this Agreement are inserted for convenience of reference only and shall not affect interpretation of this Agreement. Whenever the context shall require, each term stated in either the singular or plural shall include the singular and the plural, and masculine or neuter pronouns shall include the masculine, the feminine and the neuter.

11.06.   <u>No Waiver</u>. No failure or delay on the part of any Member in exercising any rights under this Agreement, or in insisting on strict performance of any covenant or condition contained in this Agreement, shall operate as a waiver of any of such Member's rights hereunder.

11.07.   <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

11.08.   <u>Assignment</u>. Other than Transferable Interests, no assignment of any rights or delegation of any obligations provided for in this Agreement shall be made by any Member without the prior written consent of the other Members.

11.09.   <u>No Reliance</u>. No third party is entitled to rely on any of the representations, warranties, and agreements of the Members contained in this Agreement; and the Members assume no liability to any third party because of any such reliance.

11.10   <u>Arbitration</u>.   This Agreement and the transactions contemplated hereby shall be governed by and construed under the law of the State of California and the United States without regard to conflicts of laws provisions thereof and without regard to the United Nations Convention on Contracts for the International Sale of Goods. Except that either party may seek equitable or similar relief from any court of competent jurisdiction, any dispute, controversy or claim arising out of or in relation to this Agreement, or at law, or the breach, termination or invalidity of this

Agreement that cannot be settled amicably by agreement of the parties to this Agreement shall be submitted to binding arbitration, administered by JAMS, presided over by an arbitrator mutually agreeable to both parties and governed by JAM's comprehensive arbitration rules and procedures in effect at the time the dispute arises. The place of arbitration shall be San Francisco, California. The award rendered shall be final and binding on both parties. The proceedings shall be confidential other than as necessary to enforce in a court. Judgment on the award may be entered in any court of competent jurisdiction. In any action or proceeding to enforce rights under this Agreement, the prevailing party shall be entitled to recover costs and attorneys' fees.

**IN WITNESS WHEREOF,** all of the Members have executed this Agreement effective as of the April 15, 2024.


_____      _____
*Signature*                    *date*    *Signature*                    *date*

Tim Wobig                            Marc Lurie, Co-Trustee
19557 Molly St Unit B                The Lurie Family Trust
Elkhorn NE 68022-6550                2950 Windtree Ct
                                     Lafayette CA  94549


_____
*Signature*                    *date*

Patrick Burgess
1006 Columbine Rd
Asheville NC 28803

      :: NOTARY ::

State of _____

County _____

Subscribed and sworn to (or affirmed) before me this _____ day of _____, 20___, by_____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.


_____

Notary Public, State of _____     (Notary Seal)

My commission expires:

My commission number is:

**Spousal Agreement**

The undersigned certifies:

1.      I am the spouse of _____, who on or about April 15, 2024, signed the foregoing First Amended and Restated Operating Agreement ("Agreement") for, and is a Member of, Wobig LLC ("Company").

2.      I have read and approve the provisions of the Agreement including, but not limited to, those relating to the purchase, sale or other disposition of the interest of a deceased, divorced, legally separated, withdrawing, or dissociating Member, and I agree to be bound by and accept such provisions in lieu of all other interests I may have in the Company, whether the interest may be community property or otherwise.

3.      Except as required by law, my spouse shall have full power of management of his or her interest in the Company, including any portion of that interest that is our community property, and he or she shall have the full right, without my further approval, to exercise his or her voting rights as a Member of the Company, to execute any amendments to the Agreement, and to sell, transfer, encumber and deal in any manner with his or her Company interest, including any portion of such interest that is our community property.


_____
*Signature*                                                    *date*

_____
*Printed Name*

        :: NOTARY ::

State of _____

County _____

Subscribed and sworn to (or affirmed) before me this _____day of _____, 20___, by_____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.



_____

Notary Public, State of _____                    (Notary Seal)

My commission expires:

My commission number is:

Agreement that cannot be settled amicably by agreement of the parties to this Agreement shall be submitted to binding arbitration, administered by JAMS, presided over by an arbitrator mutually agreeable to both parties and governed by JAM's comprehensive arbitration rules and procedures in effect at the time the dispute arises. The place of arbitration shall be San Francisco, California. The award rendered shall be final and binding on both parties. The proceedings shall be confidential other than as necessary to enforce in a court. Judgment on the award may be entered in any court of competent jurisdiction. In any action or proceeding to enforce rights under this Agreement, the prevailing party shall be entitled to recover costs and attorneys' fees.

**IN WITNESS WHEREOF,** all of the Members have executed this Agreement effective as of the April 15, 2024.

_____    _____
Signature                        date    Signature                        date

Tim Wobig                                Marc Lurie, Co-Trustee
19557 Molly St Unit B                    The Lurie Family Trust
Elkhorn NE 68022-6550                    2950 Windtree Ct
                                         Lafayette CA  94549

_____  6/8/24
Signature                        date

Patrick Burgess
1006 Columbine Rd
Asheville NC 28803

        :: NOTARY ::

State of ____North Carolina____

County ____Buncombe____

Subscribed and sworn to (or affirmed) before me this __8__ day of ____June____, 20__24__
by____Joel  H.  Kerley____, proved to me on the basis of satisfactory
evidence to be the person(s) who appeared before me.

_____

Notary Public, State of __North Carolina__

My commission expires:   05/08/2029

**My commission number is:**  2024134002 04

JOEL H KERLEY
NOTARY PUBLIC
BUNCOMBE COUNTY, NC
MY COMMISSION EXP:05/08/2029
202413400204

Agreement that cannot be settled amicably by agreement of the parties to this Agreement shall be submitted to binding arbitration, administered by JAMS, presided over by an arbitrator mutually agreeable to both parties and governed by JAM's comprehensive arbitration rules and procedures in effect at the time the dispute arises. The place of arbitration shall be San Francisco, California. The award rendered shall be final and binding on both parties. The proceedings shall be confidential other than as necessary to enforce in a court. Judgment on the award may be entered in any court of competent jurisdiction. In any action or proceeding to enforce rights under this Agreement, the prevailing party shall be entitled to recover costs and attorneys' fees.

**IN WITNESS WHEREOF,** all of the Members have executed this Agreement effective as of the April 15, 2024.

_____   31/MAY/2024   _____
Signature                           date          Signature                         date

**Tim Wobig**                                     **Marc Lurie, Co-Trustee**
19557 Molly St Unit B                             **The Lurie Family Trust**
Elkhorn NE 68022-6550                             2950 Windtree Ct
                                                  Lafayette CA 94549


_____   _____
Signature                           date

**Patrick Burgess**
1006 Columbine Rd
Asheville NC 28803

:: NOTARY ::

State of _Nebraska_

County _Douglas_

Subscribed and sworn to (or affirmed) before me this _31_ day of _May_, 2024, by _Tim Wobig_, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.


_____

Notary Public, State of _Nebraska_

GENERAL NOTARY-State of Nebraska
ASHLEY MESCHER
My Comm. Exp. July 17, 2027

(Notary Seal)

My commission expires: _July 17, 2027_

My commission number is:

Agreement that cannot be settled amicably by agreement of the parties to this Agreement shall be submitted to binding arbitration, administered by JAMS, presided over by an arbitrator mutually agreeable to both parties and governed by JAM's comprehensive arbitration rules and procedures in effect at the time the dispute arises. The place of arbitration shall be San Francisco, California. The award rendered shall be final and binding on both parties. The proceedings shall be confidential other than as necessary to enforce in a court. Judgment on the award may be entered in any court of competent jurisdiction. In any action or proceeding to enforce rights under this Agreement, the prevailing party shall be entitled to recover costs and attorneys' fees.

**IN WITNESS WHEREOF,** all of the Members have executed this Agreement effective as of the April 15, 2024.

_____    _____
*Signature*                    *date*    *Signature*                    *date*

Tim Wobig                             Marc Lurie, Co-Trustee
19557 Molly St Unit B                 The Lurie Family Trust
Elkhorn NE 68022-6550                 2950 Windtree Ct
                                      Lafayette CA 94549

_____
*Signature*                    *date*

Patrick Burgess
1006 Columbine Rd
Asheville NC 28803

    :: NOTARY ::

State of _California_

County _Contra Costa_

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

Subscribed and sworn to (or affirmed) before me this _7_ day of _June_____, 20_24_, by _Marc Lurie_____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____

CHANO M.F. REAL
Notary Public - California
Contra Costa County
Commission # 2428099
My Comm. Expires Nov 24, 2026

Notary Public, State of _California_        (Notary Seal)

My commission expires: _11/24/2026_

My commission number is: _2428099_

## Spousal Agreement

The undersigned certifies:

1.      I am the spouse of _Marc Lurie_____, who on or about April 15, 2024, signed the foregoing First Amended and Restated Operating Agreement ("Agreement") for, and is a Member of, Wobig LLC ("Company").

2.      I have read and approve the provisions of the Agreement including, but not limited to, those relating to the purchase, sale or other disposition of the interest of a deceased, divorced, legally separated, withdrawing, or dissociating Member, and I agree to be bound by and accept such provisions in lieu of all other interests I may have in the Company, whether the interest may be community property or otherwise.

3.      Except as required by law, my spouse shall have full power of management of his or her interest in the Company, including any portion of that interest that is our community property, and he or she shall have the full right, without my further approval, to exercise his or her voting rights as a Member of the Company, to execute any amendments to the Agreement, and to sell, transfer, encumber and deal in any manner with his or her Company interest, including any portion of such interest that is our community property.

_Elizabeth Lurie_    _6-7-24_
Signature                          date

_Elizabeth Lurie_
Printed Name

:: NOTARY ::

State of _California_

County _Contra Costa_

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

Subscribed and sworn to (or affirmed) before me this _7_ day of _June_, 20_24_, by _Elizabeth Lurie_, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_CReal_

> CHANO M.F. REAL
> Notary Public - California
> Contra Costa County
> Commission # 2428099
> My Comm. Expires Nov 24, 2026

Notary Public, State of _California_                    (Notary Seal)

My commission expires: _11/24/2026_

My commission number is: _2428099_

## Spousal Agreement

**The undersigned certifies:**

1.   **I am the spouse of** _Patrick   Burgess_ , **who on or about April 15, 2024, signed the foregoing First Amended and Restated Operating Agreement** ("Agreement") for, and is a Member of, Wobig LLC ("Company").

2.   I have read and approve the provisions of the Agreement including, **but not** limited to, those relating to the purchase, sale or other disposition of the interest of a **deceased,** divorced, legally separated, withdrawing, or dissociating Member, and I agree to be **bound by** and accept such provisions in lieu of all other interests I may have in the Company, **whether the** interest may be community property or otherwise.

3.   Except as required by law, my spouse shall have full power of management **of his** or her interest in the Company, including any portion of that interest that is our community property, and he or she shall have the full right, without my further approval, to exercise **his or** her voting rights as a Member of the Company, to execute any amendments to the **Agreement,** **and to sell, transfer, encumber and deal in any manner with his or her Company interest,** **including any portion of such interest that is our community property.**

_Jennifer Burgess_  6-8-2024
_____
Signature                                            date

_Jennifer Burgess_
_____
Printed Name

:: NOTARY ::

State of __North Carolina__

County __Buncombe__

Subscribed and sworn to (or affirmed) before me this __8__ day of __June__ , __2024__,
by__Joel  H.  Kerley__ , proved to me on the basis of satisfactory
evidence to be the person(s) who appeared before me.

_____

Notary Public, State of __North Carolina__

My commission expires:  05 / 08 / 2029

My commission number is:  202413400204

JOEL H KERLEY
NOTARY PUBLIC
BUNCOMBE COUNTY, NC
MY COMMISSION EXP:05/08/2029
202413400204

**Spousal Agreement**

The undersigned certifies:

1.    I am the spouse of ___Timothy Wobig___, who on or about April 15, 2024, signed the foregoing First Amended and Restated Operating Agreement ("Agreement") for, and is a Member of, Wobig LLC ("Company").

2.    I have read and approve the provisions of the Agreement including, but not limited to, those relating to the purchase, sale or other disposition of the interest of a deceased, divorced, legally separated, withdrawing, or dissociating Member, and I agree to be bound by and accept such provisions in lieu of all other interests I may have in the Company, whether the interest may be community property or otherwise.

3.    Except as required by law, my spouse shall have full power of management of his or her interest in the Company, including any portion of that interest that is our community property, and he or she shall have the full right, without my further approval, to exercise his or her voting rights as a Member of the Company, to execute any amendments to the Agreement, and to sell, transfer, encumber and deal in any manner with his or her Company interest, including any portion of such interest that is our community property.

___Katie J. Wobig___
Signature                                    date

___Katie J. Wobig___
Printed Name

:: NOTARY ::

State of ___Nebraska___

County ___Douglas___

Subscribed and sworn to (or affirmed) before me this __31__ day of __May__, 20__24__, by___Katie Wobig___, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____

Notary Public, State of ___Nebraska___

My commission expires: __July 17, 2027__

My commission number is:

GENERAL NOTARY-State of Nebraska
ASHLEY MESCHER
My Comm. Exp. July 17, 2027

(Notary Seal)

# Exhibit 2

## WRITTEN CONSENT OF THE MEMBERS OF WOBIG LLC IN LIEU OF MEETING

**Pursuant to Section 6.09 of the Second Amended & Restated Operating Agreement**

The undersigned, being the Member holding **53.68% of the Voting Interest** of Wobig LLC, hereby consents in writing, **effective immediately**, to the following actions:

## 1. Removal of Manager

WHEREAS, pursuant to **Section 3.01(c)** of the Operating Agreement, the Manager serves until death, incapacity, resignation, or **removal by Company Vote**;

WHEREAS, Marc Lurie has engaged in conduct detrimental to the Company, including but not limited to:

- **Breach of fiduciary duties** under **Section 3.03**,

- **Unilateral attempt to dissolve the Company** in violation of the Operating Agreement,

- **Obstruction of business operations** and **interference with contractual obligations**,

NOW, THEREFORE, BE IT RESOLVED that **Marc Lurie is hereby immediately removed as Manager of Wobig LLC**, effective upon the execution of this Written Consent.

## 2. Appointment of New Manager

BE IT FURTHER RESOLVED that, **effective immediately, Tim Wobig is appointed as the Manager** of Wobig LLC, with full authority to manage the Company as set forth in the Operating Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Written Consent as of the date set forth below.

**Signed:**

**Tim Wobig**
Member, Wobig LLC

**Date: February 18, 2025**

**NOTICE OF REMOVAL AS MANAGER OF WOBIG LLC**

**Date:** February 18, 2025

**To:** Marc Lurie

**From:** Tim Wobig, Majority Member of Wobig LLC

**Subject:** Immediate Removal as Manager

Dear Mr. Lurie,

Pursuant to **Section 3.01(c) of the Second Amended & Restated Operating Agreement of Wobig LLC**, you are **hereby removed as Manager of the Company, effective immediately**. This removal has been executed by **Written Consent of the Majority Member** in accordance with **Section 6.09** of the Operating Agreement, eliminating the need for a formal meeting.

You **no longer have any authority** to act on behalf of Wobig LLC, and you **must cease all managerial activities and access to Company accounts immediately**.  You must return all passwords, passkeys and restore the company email accounts to my account. And return all existing and incoming inventory to me at the following address, shipped within 48 hours:

20603 Hascall St. Elkhorn, NE 68022

If you have any outstanding Company property, records, all current tallboy and hanger correspondence for manufacturing and engineering and all financial access you are **required to return or relinquish them immediately** to the address above as stated for the inventory.

Sincerely,

**Tim Wobig**
Member, Wobig LLC

**Date: February 18, 2025**

# Exhibit 3

### REVOKING MEMBERSHIP INTEREST & EXPULSION OF MARC LURIE

**THIS WRITTEN CONSENT**, executed and effective as of **February 18, 2025**, is made pursuant to **Section 7.04(f) of the Second Amended & Restated Operating Agreement** of Wobig LLC (the "Operating Agreement") by the undersigned Members, holding a majority of the Voting Interest of the Company.

**WHEREAS:**

1. **Marc Lurie ("Lurie") is a Member of Wobig LLC** pursuant to the Operating Agreement.

2. **Lurie has committed material breaches of the Operating Agreement, for which there is no cure warranting his expulsion**, including but not limited to:

   o **Material breach of fiduciary duties** under **Section 3.03** of the Operating Agreement.

   o **Mismanagement of company affairs, obstruction of business operations**.

   o **Unilateral and unauthorized attempt to dissolve the Company** in violation of **Section 9.01** of the Operating Agreement.

   o **Interference with Company obligations**, including but not limited to attempts to obstruct a negotiated business agreement, exposing the Company to legal liability.

   o **Failure to act in good faith** and violation of the duty of loyalty, actively working against the interests of the Company and its Members.

3. **Section 7.04(f) of the Operating Agreement provides that a Member may be expelled by Company Vote if they have materially breached their fiduciary duties or any term, covenant, or condition of the Operating Agreement**.

4. **Pursuant to the authority granted under Section 7.04(f), the undersigned Members hereby revoke all Membership Interests held by Marc Lurie and expel him as a Member of Wobig LLC**.

**RESOLUTIONS**

NOW, THEREFORE, BE IT RESOLVED, that:

1. **EXPULSION OF MARC LURIE**

   o **Marc Lurie is hereby expelled as a Member of Wobig LLC, effective immediately**.

   o As a result of his expulsion, **he shall no longer hold any rights, privileges, or decision-making authority as a Member of the Company**.

2. **REVOCATION OF MEMBERSHIP INTERESTS**

   o All **Membership and Voting Interests previously held by Lurie are revoked** and **converted into a Transferable Interest** pursuant to **Section 5.02(f) of the Operating Agreement**.

   o Lurie **shall no longer have any voting rights, rights to distributions, or participation in Company management**.

3. **FORFEITURE OF COMPANY RIGHTS & ACCESS**

   o   Lurie **shall immediately cease to act, or represent himself, as a Member of Wobig LLC**.

   o   **All company assets, financial accounts, records, intellectual property, and any other proprietary information in his possession must be returned to the Company immediately**.

   o   Lurie **shall not have access to Company operations, records, financials, or any other proprietary information**.

4. **NOTICE TO RELEVANT PARTIES**

   o   The Company shall **immediately notify all vendors, financial institutions, employees, and partners that Marc Lurie is no longer a Member of the Company** and has **no authority to act on its behalf**.

**AUTHORIZATION & EXECUTION**

IN WITNESS WHEREOF, the undersigned Members of Wobig LLC, constituting a **majority of the Voting Interest**, have executed this Written Consent to **expel Marc Lurie and revoke his Membership Interests**, effective immediately as of the date first written above.

Sincerely,

**Tim Wobig**
Member, Wobig LLC

**Date: February 18, 2025**

**WRITTEN CONSENT OF THE MEMBERS OF WOBIG LLC IN LIEU OF MEETING**

**Pursuant to Section 6.09 of the Second Amended & Restated Operating Agreement**

The undersigned, being the Member holding **53.68% of the Voting Interest** of Wobig LLC, hereby consents in writing, **effective immediately**, to the following actions:

**1. <u>Removal of Manager</u>**

WHEREAS, pursuant to **Section 3.01(c)** of the Operating Agreement, the Manager serves until death, incapacity, resignation, or **removal by Company Vote**;

WHEREAS, Marc Lurie has engaged in conduct detrimental to the Company, including but not limited to:

- **Breach of fiduciary duties** under **Section 3.03**,

- **Unilateral attempt to dissolve the Company** in violation of the Operating Agreement,

- **Obstruction of business operations** and **interference with contractual obligations**,

NOW, THEREFORE, BE IT RESOLVED that **Marc Lurie is hereby immediately removed as Manager of Wobig LLC**, effective upon the execution of this Written Consent.

**2. <u>Appointment of New Manager</u>**

BE IT FURTHER RESOLVED that, **effective immediately, Tim Wobig is appointed as the Manager** of Wobig LLC, with full authority to manage the Company as set forth in the Operating Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Written Consent as of the date set forth below.

**Signed:**

**Tim Wobig**
Member, Wobig LLC

**Date: February 18, 2025**

**NOTICE OF REMOVAL AS MANAGER OF WOBIG LLC**

**Date:** February 18, 2025

**To:** Marc Lurie

**From:** Tim Wobig, Majority Member of Wobig LLC

**Subject:** Immediate Removal as Manager

Dear Mr. Lurie,

Pursuant to **Section 3.01(c) of the Second Amended & Restated Operating Agreement of Wobig LLC**, you are **hereby removed as Manager of the Company, effective immediately**. This removal has been executed by **Written Consent of the Majority Member** in accordance with **Section 6.09** of the Operating Agreement, eliminating the need for a formal meeting.

You **no longer have any authority** to act on behalf of Wobig LLC, and you **must cease all managerial activities and access to Company accounts immediately**.  You must return all passwords, passkeys and restore the company email accounts to my account. And return all existing and incoming inventory to me at the following address, shipped within 48 hours:

20603 Hascall St. Elkhorn, NE 68022

If you have any outstanding Company property, records, all current tallboy and hanger correspondence for manufacturing and engineering and all financial access you are **required to return or relinquish them immediately** to the address above as stated for the inventory.

Sincerely,

**Tim Wobig**
Member, Wobig LLC

**Date: February 18, 2025**

# Exhibit 4



**Subject:** Fwd: Important Update from Wobig LLC
**Date:** February 22, 2025 at 2:23 PM
**To:** Marc Lurie marclurie@me.com

Begin forwarded message:

**From:** "Wobig, Timothy D MAJ USARMY NG CAARNG (USA)" <timothy.d.wobig.mil@army.mil>
**Date:** February 22, 2025 at 12:08:13 PM PST
**To:** "Wobig, Timothy D MAJ USARMY NG CAARNG (USA)" <timothy.d.wobig.mil@army.mil>
**Subject: Important Update from Wobig LLC**

Dear WOBIG Team / Partners / Vendors and Potential Clients,

I hope this email finds you well. I am reaching out to share an important update regarding Wobig LLC.

Effective 18FEB2025 Marc Lurie has been notified and is no longer authorized to represent Wobig LLC in any official capacity. Please ensure that all communications, transactions, and inquiries related to Wobig LLC are directed to me.

If there has been any correspondence with Marc since his notification on 18FEB2025, I ask that you please reach out to me directly, no matter how small the issue so that we can have a record of the interaction.

If you have any questions or need clarification, feel free to reach out to me directly at any time. And if necessary, I can pass on any request to my legal Team.

There are some of your team members that were not on this email; if you are a part of WOBIG, and have a larger team representing us, I ask that you please disseminate this information to your peers and to the lowest level.

(Also attached is a PDF of the information referenced above in more detail, for your records, also to be passed on to your team in its entirety if you would please)

Thank you for your attention to this matter.

Very Respectfully,

Very Respectfully,

Tim Wobig

CEO

Wobig LLC

Cell: 402.660.8183

Email: (Temporary) timothy.d.wobig.mil@army.mil

[www.wobiggear.com](http://www.wobiggear.com)

 **WOBIG Notification Letter.pdf**

# Exhibit 5

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮mil@socom.mil
**Subject:** RE: (U) [Non-DoD Source] Custom Order
**Date:** September 9, 2025 at 9:17 AM
**To:** Marc Lurie marc@wobiggear.com



**Classification: UNCLASSIFIED**

Message Body Classification: UNCLASSIFIED

Marc,

Thanks for reaching out. We have the same 889 on file that you provided. I do not have or am aware of another 889 provided with different info. Generally, we utilize the same 889 a company provides for every purchase from that company until that 889 expires. Until recently (about 2 weeks ago) I was unaware of your ongoing company disputes. Let me know if there is anything else needed from our end.

V/R

▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

USSOCOM

▮▮▮▮▮▮
NIPR: ▮▮▮▮▮▮▮.mil@socom.mil
SIPR: ▮▮▮▮▮@soc.smil.mil

---

**From:** Marc Lurie <marc@wobiggear.com>
**Sent:** Monday, September 8, 2025 1:21 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (USA) ▮▮▮▮▮▮▮.mil@socom.mil>
**Subject:** Fwd: (U) [Non-DoD Source] Custom Order

▮▮▮,

Forwarding an email I sent to ▮▮▮ this morning.

It appears that the recent Wobig LLC order from ▮▮▮▮▮▮▮▮▮ was fulfilled by an identically named company formed and operating out of Nebraska. We didn't know this was happening or we would have stepped in earlier. Can you tell me if that company filed a separate Form 889 with you—or did they ride ours? A copy of our original Form 889 is attached in case that is helpful.

Fyi, in case you decide to check USG databases for additional due diligence, you'll see that the patents are held by the original California company. That is the only company legally authorized to sell and ship this product.

Marc Lurie
CEO
Wobig LLC


Begin forwarded message:

**From:** Marc Lurie <marc@wobiggear.com>
**Subject: Re: (U) [Non-DoD Source] Custom Order**
**Date:** September 8, 2025 at 9:03:12 AM PDT
**To:** "Maj ███████████████" <██████████.mil@socom.mil>

Maj ████

Following up.  Earlier this year, after a dispute with the partnership, one of the partners of Wobig LLC started a company with an identical name in a different state.  He has since been attempting to redirect orders from the original company to that doppelgänger entity.

Until I received your re-order inquiry, I thought that he had only attempted to do this with civilian entities.  Now I see that he appears to have successfully used his LLC with an identical name to intercept, fulfill, and take payment for our company's original quote of ██ customized units for ████████████.

There is a second issue.  With that quote we provided our company's CAGE and UEI on form 889.  We are concerned that the clearances associated with these numbers may have been wrongfully used by this individual to obtain DoD payment for his doppelgänger.  (I want to stress that we haven't yet confirmed this one way or the other.)  If so, we may end up getting a tax bill for revenue that went to a doppelgänger selling our own patented product against us.

I want to apologize for this mess.  We had no idea that this was happening with the quote or we would have nipped it in the bud.  In any case, we don't like that it got to your door and want to make it up to you and your unit, so your next order is free.

For us, it's not about the diverted revenue or any of the other acts described above.  We just want to do right by the people we work with and especially with the community you represent.  If you have any questions, you are welcome to call me anytime.

VR
Marc Lurie
CEO
Wobig LLC
925 405 7015

> On Aug 25, 2025, at 9:31 AM, ████████████ MIL USSOCOM SOCOM (USA) <██████████.mil@socom.mil> wrote:

**Classification: UNCLASSIFIED**

Message Body Classification: UNCLASSIFIED

Wobig Team,

Following back up with you from my work email. Are you able to do group pricing or at a minimum engrave our ███ logo onto the top?

v/r,

████████████████
███████
NIPR: ████████████ .mil@socom.mil
SIPR: ███████ @soc.smil.mil
CELL: ██████████
NIPR: ██████████
SIPR: ████████

---

**From:** ███████████████ @gmail.com>
**Sent:** Thursday, August 21, 2025 2:38 PM
**To:** support@wobigtactical.com
**Cc:** ████████ MIL USSOCOM SOCOM (USA)
████████ .mil@socom.mil>
**Subject:** [Non-DoD Source] Custom Order

WOBIG Team,

You completed a fairly large order for my unit ██████
██ with the squadron logo on it (████████). I'm one of the fires guys at the unit and was curious if I could put together an order and we could have our fires logo engraved on the top.

My military email address is cc'd and our logo is attached.

V/R

██████████

Message Body Classification: UNCLASSIFIED

**Classification: UNCLASSIFIED**




Message Body Classification: UNCLASSIFIED

**Classification: UNCLASSIFIED**

# Exhibit 6

**Trademark/service mark application, Principal Register**
Serial number: 99387170
Mark: WOBIG PORTABLE GEARSTAND
Mark format: Standard character
Filing date: September 11, 2025 at 11:19:37 AM ET
Docket number:
Owner name: Forti-Tac LLC
Amount paid: $ 350 (1 class)

# Trademark details

## Mark

WOBIG PORTABLE GEARSTAND

## Mark Format

**Standard character**
The mark consists of standard characters, without claim to any particular font style, size, or color.

# Owner information

| | |
|---|---|
| *Name | Forti-Tac LLC |
| Entity type | Limited liability company |
| Place of organization/citizenship | Nebraska |
| **Mailing address information** | |
| *Address line 1 | 20603 Hascall St |
| *City | Elkhorn |
| *State/territory | Nebraska |
| *Zip/postal code | 68022 |
| *Country/region/jurisdiction/territory | United States |
| *Email address | ******* |
| Primary telephone number | (402) 660-8183 |
| Owner website URL | www.wobiggear.com |
| **Domicile address information** | |

The mailing address is the same as the owner's domicile address.

# Goods and services

## Filing basis information

Section 1(a)

## Identification of goods and services

**International Class 020**

Filing basis: Section 1(a)

Sculptures of **Non-metal portable stands and racks for organizing and storing tactical equipment, protective vests, helmets, and gear**

| Specimen Information | |
|---|---|
| First use anywhere date | At least as early as 12/01/2023 |
| First use in commerce date | At least as early as 12/01/2023 |
| Specimen file name | WOBIG Portable Gearstand Buy Page.pdf |
| URL | www.wobiggear.com |
| Date of access | 09/11/2025 |
| Description | This is my website buy page for the WOBIG Portable Gearstand |

| Specimen Information | |
|---|---|
| First use anywhere date | At least as early as 12/01/2023 |
| First use in commerce date | At least as early as 12/01/2023 |
| Specimen file name | WOBIG Title Page on Site.pdf |
| URL | www.wobiggear.com |
| Date of access | 09/11/2025 |
| Description | My website Title Page for the WOBIG Portable Gearstand |

**Specimen Information**

| First use anywhere date | At least as early as 12/01/2023 |
|---|---|
| First use in commerce date | At least as early as 12/01/2023 |
| Specimen file name | WOBIG CUT SHEET.pdf |
| URL | www.wobiggear.com |
| Date of access | 09/11/2025 |
| Description | Explanation of product, and its design |

## Additional statements

| Translation (if applicable) | |
|---|---|
| Transliteration (if applicable) | |
| Consent (name/likeness) (if applicable) | The name shown in the mark identifies Timothy Wobig, a living individual whose consent to register is made of record. |
| Claim of ownership of active prior registrations(s) (if applicable) | |
| Section 2(f) Claim of acquired distinctiveness (if applicable) | |
| Additional statements including use of the mark in another form (if applicable) | |
| Significance of mark | WOBIG has significance or is a term of art in the relevant trade of industry or as used in connection with the goods or services listed in the application, as follows: A name/word that has been used in the tactical industry, with my first product, www.wobiggear.com |
| Disclaimer | |

## Correspondence information

| *Correspondence name | Forti-Tac LLC |
|---|---|
| *Primary correspondence email address | wobigstands@gmail.com |
| Courtesy copy email addresses | tim@wobigsgear.com; wobigstands@gmail.com |

## Fee information

| Application filing option | Trademark/service mark application, Principal Register |
|---|---|
| Number of classes | 1 |
| Base application fee, per class | $ 350 |
| Total fees paid | $ 350 |

## Declaration and signature

### Declaration

[ X ] Basis:

If the applicant is filing the application based on use in commerce under 15 U.S.C. § 1051(a):

- The signatory believes that the applicant is the owner of the trademark/service mark sought to be registered;
- The mark is in use in commerce and was in use in commerce as of the filing date of the application on or in connection with the goods/services in the application;
- The specimen(s) shows the mark as used on or in connection with the goods/services in the application and was used on or in connection with the goods/services in the application as of the application filing date; and
- To the best of the signatory's knowledge and belief, the facts recited in the application are accurate.

And/or

If the applicant is filing the application based on an intent to use the mark in commerce under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e):

- The signatory believes that the applicant is entitled to use the mark in commerce;
- The applicant has a bona fide intention to use the mark in commerce and had a bona fide intention to use the mark in commerce as of the application filing date on or in connection with the goods/services in the application; and
- To the best of the signatory's knowledge and belief, the facts recited in the application are accurate.

[ X ] To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

[ X ] To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

[ X ] The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or submission or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

| | |
|---|---|
| Electronic Signature | /Timothy Wobig/ |
| Signatory's name | Timothy Wobig |
| Signatory's position | Managing Member |
| Date signed | 09/11/2025 |
| Signature method | Signed directly within the form |

STAMP:USPTO/APPB-**.***.***.***-20250911111937179-99387170-17.1-4241bb50-ef75-4e6f-8295-3ae410fa634c-CARD-20250911104118025544

# WOBIG PORTABLE GEARSTAND













https://www.wobiggear.com/products/stand-1

# WOBIG. PORTABLE GEARSTAND.

WOBIG protects your gear so your gear protects you

## PROTECT YOUR ARMOR INVESTMENT WITH THE
## #1 CHOICE OF TACTICAL SUPPLIERS WORLDWIDE.

**PREVENTS DEFORMATION**

Stores armor in proper shape to help prevent the deformations and creases that cause armor to fail when most needed.

**IMPROVES COMFORT**

Reduces odor and skin-damaging bacteria, which improves the health, comfort, and morale of those who put their lives on the line.

**PROTECTS INVESTMENT**

Stores armor dry and in proper shape to help comply with the use and care practices recommended by armor manufacturers.

**PRESERVES FIBERS**

Evaporates moisture during storage to help preserve the effectiveness of the life-saving fibers at the core of your armor.



**VACUUM PLATED PINS**
more durable than powder coating to resist flaking during rotation




**UNIBODY DESIGN**
stows and deploys in seconds



**MAGNETIC LOCKS**
make it fast and easy to deploy (or stow)

**STAINLESS STEEL**
screws and pins for years of use



**OVERSIZED GEARS**
easily chew through sand, dirt, and mud.

**COMPACT & ULTRALIGHT**
Only 2.3 lbs and supports more than 30x it's weight.







**RELEASE BUTTON**
machined from aluminum for longevity



**ALUMINUM SPINE**
supports at least 75 lbs.



WWW.WOBIGEAR.COM

